IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | | |
|---|---|---|
| WILLIAM COUSER and SUMMIT CARBON SOLUTIONS, LLC, | ) ) ) | Case No. 1:22-cv-00020-SMR-SBJ |
| Plaintiffs, | ) ) | ORDER ON MOTION FOR PRELIMINARY INJUNCTION |
| v. | ) ) | |
| SHELBY COUNTY IOWA, SHELBY COUNTY BOARD OF SUPERVISORS, STEVE KENKEL, in his official capacity as a Shelby County Supervisor, CHARLES PARKHURST, in his official capacity as a Shelby County Supervisor, and DARIN HAAKE, in his official capacity as a Shelby County Supervisor, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Last year, the Shelby County Board of Supervisors ("the Board") promulgated Shelby County Ordinance 2022-4 ("the Ordinance") in response to planned construction of a hazardous liquid pipeline. Plaintiffs filed this suit to enjoin enforcement of the Ordinance on the grounds that it is preempted by federal and state law. When the Board sought to enforce the Ordinance, Plaintiffs filed a Motion for Preliminary Injunction to prevent its enforcement. For the reasons discussed in detail below, the Motion is GRANTED.

I.      BACKGROUND

*A. Carbon Capture Technology in Iowa*

The State of Iowa produces a significant volume of corn, much of which is used to produce ethanol through a fermentation process. [ECF No. 26 at 9]. Many byproducts are created during this process, including carbon dioxide ("$CO_2$"). [ECF No. 26-1 at 3 (Pirolli Decl.)]. This $CO_2$ can be captured at the time of generation, transported to another location, and stored through a carbon

capture and sequestration procedure ("CCS").  *Id.*  CCS technology uses an extensive network of pipelines to transport the captured $CO_2$ from its original location to its desired destination.  *Id.*

Plaintiff Summit Carbon Solutions, LLC ("Summit") is developing an interstate network of pipelines "to implement CCS technology" in the Midwest.  [ECF No. 26-1 at 3].  This project will transport $CO_2$ from thirty-one facilities, including twelve ethanol and fertilizer plants located in Iowa, to various destinations.  [ECF Nos. 26-1 at 3; 47-2 at 1–2].  The proposed project will lead to the construction of more than six hundred and fifty miles of pipeline across thirty counties, including Shelby County.  [ECF No. 47-2 at 2].  The proposed pipeline will cross both private and public land in Shelby County.  *Id.* at 7.

### B.  Application Process with the Iowa Utilities Board

The process for constructing the proposed pipeline began when Summit held informational meetings in each of the thirty counties identified as being impacted by the project, which included Shelby County.  [ECF No. 26-1 at 4].  After the meetings, Summit filed a Petition for a Hazardous Liquid Pipeline Permit with the Iowa Utilities Board ("IUB") on January 28, 2022.  *See* [ECF No. 47-1].  The application included a description of the "proposed main line route," identified the watersheds that may be impacted, and described the facilities along the proposed route.  [ECF No. 47-2 at 8].  It explained how the applicant "performed extensive analyses utilizing Geographic Information Systems . . . to avoid or minimize features identified as moderate risk, and exclude features identified as high risk."  *Id.*  It provided "an explanation of the purpose of the project" and the "products carried" in the pipelines.  [ECF No. 47-1 at 2].  The permit application has also been involved in extensive administrative proceedings before the IUB since its submission.[1]

---

[1] The docket for the proceeding before the Iowa Utilities Board may be found at this link: https://efs.iowa.gov/efs/ShowDocketSummary.do?docketNumber=HLP-2021-0001

### C. Enactment of the Shelby County Ordinance

While the IUB proceedings were ongoing, residents of Shelby County submitted a petition to the Board requesting that it implement an ordinance regulating hazardous liquid pipelines. [ECF No. 30-1 at 60–77]. The Board referred the petition to the Shelby County Planning and Zoning Commission on August 16, 2022. [ECF No. 30-1 at 29 (Notice)]. The Commission conducted a hearing on the proposed ordinance on September 23, 2022.[2] [ECF No. 30-1 at 6–14 (Minutes of the Commission Meeting), 30]. The Planning and Zoning Commission drafted a report to the Board, explaining that the Board should adopt a zoning ordinance to address community concerns about the impact and safety of the pipeline. [ECF No. 30-1 at 121–125].

Following this report, the Board conducted three hearings on a proposed ordinance, which were held on October 18, October 25, and November 1, 2022. [ECF No. 30-1 at 32–45, 46–57, 250–63 (Minutes)]. The Board officially approved the proposal at the last meeting. *Id.* at 263. The Ordinance went into effect on November 11, 2022 upon publication in the official papers of record in Shelby County. [ECF No. 30-1 at 120 (Proof of Publication)].

### D. Components of the Challenged Ordinance

The Ordinance contains numerous sections that are directly challenged by Plaintiffs and are relevant to the Motion for Preliminary Injunction. The Court briefly reviews each below.

#### i. Introductory Section

The Ordinance begins by identifying the federal and state laws governing the transportation of hazardous liquids. [ECF No. 26-2 at 3]. The Ordinance then explicitly names Summit in its text, explaining Summit has "submitted to the IUB a Petition for a Hazardous Liquide Pipeline

---

[2] Community members provided spoken and written comments in support of the proposal. [ECF No. 30-1 at 6–14, 130–138, 221–230].

Permit" and "the IUB has not yet issued a permit to the Company." *Id.* at 4.   After identifying Summit, the next few lines of the Ordinance expressly state how the pipeline "would influence human safety in the event of a rupture." *Id.*   The Ordinance declares a pipeline rupture "could threaten the health and lives of county residents, emergency response personnel, and animals" by asphyxiation or poisoning. *Id.*   Based on the stated concerns, the Ordinance concludes the pipeline is a safety risk that should be regulated based on the framework described therein. *Id.*

### ii.   Conditional Use Structure

The Ordinance creates a "conditional use class" for all hazardous liquid pipelines in Shelby County.   [ECF No. 26-2 at 10].   Under the conditional use class, "no land or property interest in the County, regardless of the zone or area, shall be used for purposes of a Hazardous Liquid Pipeline except in conformity with this Article." *Id.*   To conform with the Ordinance, landowners and pipeline companies must apply for and receive a conditional use permit. *Id.*

### iii.   Conditional Use Permits for Pipeline Companies

Under the Ordinance, a pipeline company seeking to "construct, maintain, or operate a new Pipeline . . . in th[e] County shall submit an Application to the County Zoning Administrator for a conditional use permit." [ECF No. 26-2 at 10].   The pipeline company must include its complete IUB application, maps identifying the impacted county residents and roadways, dimensions of the pipeline, information on compliance with abandonment and removal requirements, an emergency response and hazard mitigation plan, the written template that will be used to negotiate easements with landowners in the County, and certain fees. *Id.* at 11–12.   Under the Ordinance, the application must be submitted to the Board within seven days of the pipeline company filing its petition for a permit with the IUB. *Id.* at 10.

After submission, the Ordinance tasks the Shelby County Zoning Administrator ("the Administrator") with verifying that "the Pipeline Company permit application requirements are met." [ECF No. 26-2 at 13]. Specifically, the Administrator "shall make a report to the Board of Adjustment recommending approval, denial, or modification of the Application." *Id.* The Board of Adjustment shall "set the date of one or more public hearings in the County on the question of granting a conditional use permit to the Pipeline Company." *Id.* "Once the application, public hearing, and other requirements of the Article are met, the Board of Adjustment shall consider each application." *Id.* If all "applicable standards are met . . . [t]he Board of Adjustment shall issue a permit." *Id.* The burden of proof is "on the Applicant for the conditional use permit." *Id.*

The Ordinance imposes certain fees for conditional use permits. [ECF No. 26-2 at 12]. For pipeline owners, the Ordinance requires payment of "$100 for each Affected Person identified in the application." *Id.* An affected person is "any Person with a legal right or interest in the property, including but not limited to a landowner, a contract purchaser of record, a Person possessing the property under a lease, a record lienholder, and a record encumbrancer of the property." *Id.* at 6. There is also "an annual assessment fee in the amount of $116.92 per mile of Pipeline constructed, operated, and maintained in the County or an amount equal to the most current user fee assessed to the operators of Hazardous Liquid Pipelines by PHMSA [the Pipeline and Hazardous Materials Safety Administration], whichever is greater." *Id.* The Ordinance explains that the secondary fee is used for "emergency planning and hazardous mitigation costs, including expenses for law enforcement and emergency response." *Id.*

iv. Emergency Preparedness Requirements

As noted in the preceding section, an application for a conditional use permit by a pipeline company must include extensive information on emergency response and hazard mitigation. The

application must include "documentation of compliance with PHMSA regulations" if applicable. [ECF No. 26-2 at 14].  It should identify how the "Company will work with the County's law enforcement, emergency management personnel, and first responders in the event of a spill, leak, rupture, or other emergency."  *Id.*  If there are no application PHMSA regulations, a pipeline company must provide a map and description of the proposed route, a description of the health risks, an estimate of the worst-case scenario for a carbon discharge, a list of structures and facilities in a fallout zone, a list of "high consequence areas" where a rupture would be more likely to result in the loss of life, alternative routes through the county designed to minimize risk, and "all information needed by county first responders . . . to engage in local emergency management." *Id.* at 14–15.  Lastly, the pipeline company may need to provide "a Carbon Dioxide Pipeline rupture emergency response training program" and equipment for "response personnel." *Id.* at 15.

v.   Conditional Use Permits for Landowners

A landowner that "intends to negotiate or sell an easement to a Pipeline Company by means of an Independent Agreement shall submit an application to the County Zoning Administrator for a conditional use permit." [ECF No. 26-2 at 10].  The application must include "[t]he information required for a conditional use permit as described in section 4.151 of this Zoning Regulation, including all required forms." *Id.* at 12.  The landowner must provide a "copy of the Independent Agreement the Property Owner proposes to execute with the Pipeline Company, including a map and a legal description of the proposed Line Location, and a statement of verification of compliance with the separation requirements." *Id.*  The landowner must pay a fee. *Id.* at 13.  The approval process for conditional use permits for landowners is similar to the one for pipeline companies; the primary difference is landowners do not face a public hearing. *Id.*  Only after receiving approval can the landowner sign an Independent Agreement. *Id.* at 10.

vi.    Abandonment, Discontinuance, and Removal of Pipelines

Beyond the conditional use permit regime, the Ordinance requires a pipeline company who is granted a conditional use permit to "notify the County and all Affected Persons in the County of [its] intent to discontinue the use of the Pipeline."  [ECF No. 26-2 at 16].  The notice must be provided by certified mail and must state a "proposed date of discontinuance." *Id.*  The Ordinance requires a pipeline owner to "offer to each property owner the option to have the Pipeline and all related facilities physically dismantled and removed, including both the below and above ground facilities." *Id.*  The costs of removal and reclamation of the land are borne by the pipeline operator. *Id.*  Once removal is complete, the Ordinance states that "the Pipeline Owner shall restore the land according to the requirements of Iowa Code § 479B.20." *Id.*

vii.    Distance and Separation Requirements

The Ordinance provides minimum set-back requirements for the placement of pipelines. [ECF No. 26-2 at 10].  Under its terms, a hazardous liquid pipeline can be no less than two miles from the city limits of an incorporated city. *Id.* at 11.  It may be no less than one half mile from a church, school, nursing home, long-term care facility, or hospital. *Id.*  A pipeline must be at least one-quarter of a mile from a public park or recreation area. *Id.*  Any project must be "not less than 1,000 feet" from a confined animal feeding operation, an electric power generating facility, an electric transmission substation, a public drinking water treatment plant, a public wastewater treatment facility, or an "occupied structure." *Id.*  A proposed pipeline may not be within two hundred feet of "any public water system or any nonpublic water supply well." *Id.*

## II.    PROCEDURAL HISTORY

On November 15, 2022, Plaintiffs William Couser and Summit Carbon Solutions, LLC, filed this suit against Shelby County, Iowa, the Shelby County Board of Supervisors, and the

Shelby County Supervisors in their official capacities.  [ECF No. 1].  The lawsuit alleges that the Ordinance is preempted by the Pipeline Safety Act ("PSA"), a federal law regulating many aspects of pipeline safety, and Iowa Code § 479B, which provides the IUB with authority to issue permits approving the construction of pipelines.  *Id.* at 15–19.  Defendants filed a reply.  [ECF No. 16].

On January 26, 2023, the Shelby County Planning and Zoning Commission sent letters to local landowners.  [ECF No. 26-3].  The letters stated the landowners had recorded an easement conveying certain rights of access to property, but they had not received the appropriate conditional use permit prior to conveyance.  *Id.* at 2.  The letters explained that "the county may assess penalties against any person who violates the ordinance" and fine them $750.00 per day.  *Id.* at 3.  The notices concluded by stating, "[i]f the easement agreement is not terminated by 02/10/2023 in addition to the penalties described above, the county may seek involuntary termination of the easement agreement by a court."  *Id.*

On February 6, 2023, Plaintiffs filed a Motion for a Temporary Restraining Order and Preliminary Injunction.  [ECF No. 23].  The Motion asked the Court to prohibit Shelby County from: "(1) enforcing Ordinance 2022-[4], (2) implementing any other ordinances on the permitting, construction, or development of Summit's pipeline project, and (3) implementing any ordinance or other regulation that regulates safety or permitting aspects of Summit's pipeline project."  *Id.* at 2.  The next day, the Court directed Defendants to file an expedited response.  [ECF No. 27].  After conferring, the parties agreed to the entry of a temporary restraining order until they could fully brief the relevant case law and facts.  [ECF Nos. 28; 29].

The parties briefed case law and provided relevant factual information over the next month.  [ECF Nos. 30; 33; 41].  On March 31, 2023, the Court held a hearing on the Motion for Preliminary Injunction in accordance with Federal Rule of Civil Procedure 65.  [ECF No. 46].  At the end of

argument, the Court asked the parties to provide more information on the scope of $CO_2$ that could be captured by the project.  *Id.*  The requested information was submitted.  [ECF Nos. 47; 48].

Upon submission of these materials, the case is fully briefed and ready for review.  For the reasons below, the Motion for Preliminary Injunction is GRANTED.

### III.   GOVERNING LAW

#### A.  Article III Standing

Under Article III, Section II of the United States Constitution, the federal courts are limited to hearing disputes that present a "case" or "controversy."  *Raines v. Byrd,* 521 U.S. 811, 818 (1997).  "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case, in other words, standing."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (quoting *Raines*, 521 U.S. at 819).  To establish constitutional standing, a party must demonstrate three elements: "(1) a plaintiff must have suffered an 'injury in fact' (2) that is 'fairly traceable to the challenged conduct,' and (3) is 'likely to be redressed by a favorable judicial decision.'"  *Hillesheim v. Holiday Stationstores, Inc.*, 900 F.3d 1007, 1010 (8th Cir. 2018) (quotation omitted).  "[S]tanding is a jurisdictional prerequisite that must be resolved before reaching the merits of a suit."  *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007) (citing *McCarney v. Ford Motor Co*., 657 F.2d 230, 233 (8th Cir. 1981)); *Iowa League of Cities v. E.P.A*., 711 F.3d 844, 869 (8th Cir. 2013) ("If a litigant lacks Article III standing to bring his claim, then [courts] have no subject matter jurisdiction over the suit.").  Article III imposes an "independent obligation [on courts] to determine whether subject-matter jurisdiction exists, even when no party challenges it."  *Hertz Corp v. Friend*, 559 U.S. 77, 94 (2010) (citation omitted).

### B. Preliminary Injunctions

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008) (citation omitted).  District courts must consider four factors before granting a preliminary injunction:  "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other [] litigant[s]; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981) (en banc).  "No single factor in itself is dispositive." *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987).  However, the last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### C. Relationship Between Iowa Home Rule Authority and Preemption

In 1978, an amendment to the Iowa Constitution granted local authorities the power "to determine their local affairs and government." *Goodell v. Humboldt Cnty.*, 575 N.W.2d 486, 492 (Iowa 1998) (quoting Iowa Const. art. III, § 39A).  This power, known as home rule authority, allows counties and local authorities to enact ordinances on matters of their choosing "unless a particular power has been denied [to] them by statute." *City of Des Moines v. Master Builders of Iowa*, 498 N.W.2d 702, 703–04 (Iowa 1993).  The Iowa Legislature may preempt or deny local municipalities authority to enact measures on certain subjects in an express or an implied manner. *Goodell*, 575 N.W.2d at 492.  Express preemption occurs when the Iowa Legislature has directly prohibited local action in an area. *Chelsea Theater Corp. v. City of Burlington*, 258 N.W.2d 372, 373 (Iowa 1977) (holding a law passed by the Iowa Legislature preempted local regulation of obscene materials because the statute imposed "uniform[ity]."").  Implied preemption occurs if a municipality "prohibits an act permitted by a statute or permits an act prohibited by a statute." *City*

*of Des Moines v. Gruen*, 457 N.W.2d 340, 342 (Iowa 1990) (quotation omitted).  It may occur if the Legislature has "cover[ed] a subject by statutes in such a manner as to demonstrate a legislative intention that the field is preempted by state law."  *City of Council Bluffs v. Cain*, 342 N.W.2d 810, 812 (Iowa 1983).

### D.  Iowa Regulation of Pipelines

The Iowa Legislature has enacted a statute to govern the construction of pipelines.  Iowa Code § 479B.1.  Under the statute, "[a] pipeline company shall not construct, maintain, or operate a pipeline or underground storage facility under, along, over, or across any public or private highways, grounds, waters, or streams of any kind . . . except in accordance with this chapter."  Iowa Code § 479B.3.  To receive permission to construct a pipeline, the company must "file a verified petition with the board asking for a permit to construct, maintain, and operate a new pipeline."  Iowa Code § 479B.4(1).[3]  The permit application must include a "legal description of the route of the proposed pipeline and a map of the route," "[a] general description of the public or private highways, grounds, waters, streams, and private lands of any kind," "the possible use of alternative routes," and "the relationship of the proposed project to the present and future land use and zoning ordinances."  Iowa Code § 479B.5(3–7).

Once a petition is filed, the statute directs the IUB to "fix a date for a hearing."  Iowa Code § 479B.6(1)  Prior to the hearing, any individual or entity "whose rights or interests may be affected by the proposed pipeline or hazardous liquid storage facilities may file written objections . . . not less than five days before the date of the hearing on the application."  Iowa Code § 479B.7.  At the hearing, the board shall consider the petition, any objections, or testimony "in making its determination regarding the application."  Iowa Code § 479B.8.  In addition, "[t]he board may

---

[3] Iowa Code § 479B's usage of "the Board" refers to the Iowa Utilities Board.

examine the proposed route of the pipeline and location of the underground storage facility" at the hearing. *Id.*

After a hearing, the IUB "may grant a permit in whole or in part upon terms, conditions, and restrictions as to location and route as it determines to be just and proper." Iowa Code § 479B.9. A permit "shall not be granted to a pipeline company unless the board determines that the proposed services will promote the public convenience and necessity." *Id.* The applicant is responsible for "all costs of the informational meetings, hearing, and necessary preliminary investigation . . . [and] the actual unrecovered costs directly attributable to inspections conducted by the board." Iowa Code § 479B.10.

### E. Federal Preemption

The Supremacy Clause of the United States Constitution states that "the laws of the United States" are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. This means state laws that conflict with federal laws or regulations are invalid and unenforceable. *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978). This rule applies "in several different ways." *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985). First, Congress may engage in express preemption by stating its intent to do so. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). Second, Congress may preempt state laws "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Hillsborough Cnty.*, 471 U.S. at 713 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Third, federal law nullifies state law if they conflict. *Id.* (citing *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963)). Fourth, implied preemption occurs when Congress "intended to oust state law in order to achieve its objective."

*Kinley Corp v. Iowa Util. Bd.*, 999 F.2d 354, 358 n.3 (8th Cir. 1993). Both federal statutes and regulations can preempt state law. *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699 (1984).

### F.   Federal Legislation and Regulation of Pipelines

Federal statutes and regulations govern nearly every part of the construction and operation of hazardous liquid pipelines. In 1994, Congress enacted the Pipeline Safety Act ("PSA") in an attempt to provide uniformity to the federal laws governing the construction of various types of pipelines.[4] Under the PSA, the United States Department of Transportation, through the Secretary of Transportation, "shall prescribe minimum safety standards for pipeline transportation and for pipeline facilities." 49 U.S.C. § 60102(a)(2). Authority given to the Secretary of Transportation is, in turn, vested with PHMSA. 49 U.S.C. § 108. The PHMSA promulgates regulations on "the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities." 49 U.S.C. § 60102(a)(2)(B).

The PHMSA has promulgated many pipeline regulations that are relevant to this dispute. One regulation states that "[p]ipeline right-of-way must be selected to avoid, as far as practicable, areas containing private dwellings, industrial buildings, and places of public assembly." 49 C.F.R. § 195.210(a). The regulations describe how pipelines must prepare for emergencies. 49 C.F.R. § 195.402(e). Companies must implement procedures on facility abandonment that "includ[e] safe disconnection from an operating pipeline system, purging of combustibles, and sealing abandoned facilities." 49 C.F.R. § 195.402(c)(10).

In addition to regulations, the statute provides a "[s]tate authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."

---

[4] The statute incorporated previous statutes into its framework. 49 U.S.C. § 60102(a)(1). This means that decisions interpreting said statutes are relevant to interpreting the PSA. *Id.*

49 U.S.C. § 60104(c).  This language is understood to preclude "state decision-making in this area altogether."  *Kinley Corp.*, 999 F.2d at 359.  "[It] leaves no regulatory room for the state to either establish its own safety standards or supplement the federal safety standards."  *Id.* (citing *ANR Pipeline Co. v. Iowa State Com. Comm'n*, 828 F.2d 465, 472 (8th Cir. 1987)).  Put simply, the PSA is a sweeping exercise of express preemption.  *Id.*

## IV.    STANDING ANALYSIS

The first issue is whether Plaintiffs have standing to pursue their claims in federal court. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) ("[I]t is well established that the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties.").  For the reasons below, Summit has Article III standing to pursue its claims in this Court, but Couser does not.  Therefore, Couser must be DISMISSED.

### A.  *Plaintiff Summit Carbon Solutions*

#### i.   Injury in Fact

An injury-in-fact is an "invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan*, 504 U.S. at 560.  The injury-in-fact must "actually exist."  *Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 690 (8th Cir. 2017).  "Certain harms readily qualify as concrete injuries under Article III," of which "the most obvious are traditional tangible harms, such as physical harms and monetary harms." *TransUnion*, 141 S. Ct. at 2204.  An individual may not establish an injury-in-fact solely based on claims of future injury that rely on a general intent to engage in conduct.  *Lujan*, 504 U.S. at 564 (discussing how an individual asserting a future injury must have a "description of concrete plans" or "specification of when the some day will be.")

The record provides numerous instances of Summit suffering an injury-in-fact or facing a sufficiently concrete future injury.  First, the Ordinance requires Summit to apply for a conditional use permit and pay certain fees before operating in the county.  [ECF No. 26-2 at 10–11].  Second, the Ordinance imposes fees on Summit for every mile of the pipeline for the purposes of hazard mitigation and emergency response.  *Id.* at 12.  Third, Shelby County has attempted to use the Ordinance to fine landowners who have an easement agreement with Summit in an effort to force said landowners to "voluntarily" terminate the easements.  [ECF No. 26-3].  Fourth, Shelby County threatened to "seek involuntary termination" of the easement agreements by court action if the agreements were not "voluntarily" terminated within thirty days of receipt of the notice.  *Id.*

These facts establish the injury-in-fact element in two ways.  First, the application of an extensive regulatory regime to a corporation or individual creates an injury-in-fact.  *Iowa League of Cities*, 711 F.3d at 871 (holding that individuals challenging a regulatory regime suffered an injury-in-fact when they had to comply with regulations).  Second, attempts at past enforcement and concrete threats of future enforcement establish an injury-in-fact.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).  Thus, Summit has shown this first element of standing.

## ii.  Causation

To have standing, a party's injury-in-fact must be "fairly traceable" to the conduct at issue.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (noting that a plaintiff need not show "but-for" causation).  Lawsuits challenging enforcement of a statute meet this element when "there is a 'causal connection'" between the law and the asserted injury.  *Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 779 (8th Cir. 2019) (quoting *Lujan*, 504 U.S. at 560).  "[A]n injury is fairly traceable when the named defendants have the authority to enforce

the complained-of provision of law." *Northland Baptist Church of St. Paul, Minn. v. Walz*, 530 F. Supp. 3d 790, 800 (D. Minn. 2021) (citing *Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957–58 (8th Cir. 2015)).

This lawsuit names the Shelby County Board of Supervisors and its individual members. [ECF No. 1].  The County Supervisors – Steve Kenkel, Darin Haake, and Charles Parkhurst – have the authority to enact ordinances on zoning and oversee the individuals who enforce them.  [ECF No. 30-1 at 252 ("Whereas, the County may by ordinance lawfully regulate and restrict the use of land.")].  The Supervisors, acting in their official capacity, unanimously voted to enact the Ordinance.  [ECF No. 30-1 at 45, 263].  The Ordinance is the reason Summit must engage a wide range of compliance measures.  It is why Summit has faced threats of involuntary termination of its easements.  Summit's injuries are fairly traceable to the Ordinance and, by extension, Defendants.  The causation element is met.

### iii.  Redressability

The last requirement of Article III standing is that Plaintiffs' injuries must be redressable by a favorable ruling.  *Lujan*, 504 U.S. 560–61.  "To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *Calif. v. Texas*, 141 S. Ct. 2104, 2115 (2021) (quoting *Allen v. Wright*, 466 U.S. 737, 753 n.19 (1984)).  This element requires a plaintiff to provide more than speculation.  *Planned Parenthood of Mid-Mo. and E. Kan., Inc. v. Ehlmann*, 137 F.3d 573, 577 (8th Cir. 1998).  An injury is redressable when there is some "likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).

Federal courts have the authority to find that state and local laws are preempted by federal law or regulations under the Supremacy Clause.  *ANR Pipeline,* 828 F.2d at 474 (holding that Iowa

Code § 479B was preempted by the Natural Gas and Pipeline Safety Act); *Kinley Corp.*, 999 F.2d at 357 (concluding Iowa Code § 479B was preempted by the Hazardous Liquid Pipeline Safety Act). They may enjoin enforcement of preempted laws. *Arizona v. United States*, 567 U.S. 387, 394 (2012) (affirming in part and reversing in part a grant of a preliminary injunction that held certain portions of an Arizona law were preempted). Taken together, the cases suggest that the Court can grant an injunction prohibiting Defendants from enforcing the Ordinance. This injunction can prohibit enforcement of the permit regime, the fines and fees provisions, threatened enforcement, as well as any future enforcement. Such an order would relieve Summit from the injuries it has or would likely suffer. In light of this, the injury is redressable.

### iv. Summary

For the reasons discussed above, Summit has demonstrated that it has Article III standing.

### B. Plaintiff William Couser

Based on the review detailed below, the Court concludes Couser has not suffered an injury-in-fact and will not suffer a sufficiently concrete future injury. Dismissal is appropriate.

First, Couser is not impacted directly by the statute. He does not reside in Shelby County; he is a resident of Story County. [ECF No. 1 at 2]. He does not own land in Shelby County, instead possessing land in Story County. [ECF No. 1 at 9]. This means that Couser will not be subject to the conditional use permit regime or the fees imposed by the Ordinance. Nor has he signed an Independent Agreement that the County is attempting to invalidate. This means the Ordinance does not impose an "actual or threatened injury." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State*, Inc., 454 U.S. 464, 472 (1982)).

Second, Couser's remaining alleged injuries are insufficient.  Couser states he is "directly interested in the pipeline's success" because he owns a 5,200-head feed lot.  [ECF No. 1 at 9]. This lot produces hundreds of bushels of corn per acre that he sells to Lincolnway Energy for ethanol production.  *Id.*  Couser maintains he will be able to sell his corn for an increased price when the pipeline is built because the ethanol could be sold in new markets.  *Id.* at 10.  This might earn him money through the sales and Couser's ownership stake in Lincolnway Electric.

This alleged future injury is speculative and lacks enough detail to establish standing. *Lujan*, 504 U.S. at 564.  A future injury must be supported with a "description of concrete plans" or "specification of when" it will occur.  *Id.*  No supporting facts are in the record and the Court cannot determine how or when future sales would occur.  Nor can the Court determine if he would actually make additional sales or would earn more money from the construction of the pipeline. Accordingly, Couser has not established a sufficiently  concrete future injury related to the sales.

The Court cannot conclude Couser has suffered or would suffer an injury-in-fact because he is not subject to the Ordinance and any future sales are too remote and speculative under *Lujan*. In short, Couser lacks Article III standing and must be DISMISSED.

<h2 style="text-align:center">V.      PRELIMINARY INJUNCTION ANALYSIS</h2>

After concluding that Summit has standing to challenge the Ordinance, the Court examines whether Summit has shown it is entitled to a preliminary injunction based on the four *Dataphase* factors.  Each *Dataphase* factor supports the grant of a preliminary injunction.

<h3 style="text-align:center">*A.  Likelihood of Success on the Merits*</h3>

Summit maintains that the Ordinance is preempted by federal and state law.  [ECF No. 26]. Defendants respond that "Plaintiffs cannot demonstrate a substantial likelihood of success on their

claims that the County's ordinance is preempted by either state or federal law." [ECF No. 33 at 8]. For the reasons below, Summit has demonstrated it is likely to succeed on its preemption claims.

i.   Determining the Governing Standard for Success on the Merits

"Success on the merits has been referred to as the most important of the four [*Dataphase*] factors." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (citation omitted).   "There are two standards a district court may apply when assessing a movant's probability of success on the merits." *Raak Law v. Gast,* -- F. Supp. 3d --, 2022 WL 17337601 (S.D. Iowa. 2022) (quoting *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019)).   "The first, which applies in most instances, directs the district court to ask whether the party requesting a preliminary injunction has a 'fair chance of prevailing.'" *Id.* (quoting *Planned Parenthood Minn., N.D, S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)).   This requires a party to "show a 'fair chance of prevailing.'" *Jet Midwest Int'l Co., Ltd. v. Jet Midwest Grp., LLC,* 953 F.3d 1041, 1045 (8th Cir. 2020) (quoting *Rounds*, 530 F.3d at 732). Under this standard, a movant need not show they "will ultimately win." *PCTV Gold, Inc. v. SpeedNet, LLC.*, 508 F.3d 1137, 1143 (8th Cir. 2007) (citation omitted).

A second test applies to preliminary injunctions seeking to enjoin enforcement of a statute. *D.M. by Bao Xiong*, 917 F.3d at 999.   This requires a moving party to show it is "likely to prevail on the merits." *Rounds*, 530 F.3d at 732.   This heightened standard "reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference." *Id.* (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)).   A court must evaluate whether "the full play of the democratic process" was involved in the creation and implementation of these laws and then determine the applicability of the elevated standard. *D.M. by Bao Xiong*, 917 F.3d

at 1000 (quoting *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016)).  Although courts examine the process by which the laws were enacted, "[s]tate and federal statutes are the output of presumptively reasoned democratic processes." *Eggers v. Evnen*, 48 F.4th 561, 565 (8th Cir. 2022) (quotation omitted).

The record demonstrates that the Ordinance was enacted after a full play of the democratic process.  The enactment process began when Shelby County residents submitted petitions to the Board.  [ECF No. 30-1 at 60–77].  The Board referred the petition to the Shelby County Planning and Zoning Commission.  [ECF No. 30-1 at 29].  The Commission then conducted a hearing and heard testimony on the proposal.  [ECF No. 30-1 at 6–14].  The Commission drafted a report to the Board, explaining that the zoning ordinance should be adopted to address community concerns about the pipeline.  [ECF No. 30-1 at 121–125].  The Board held three hearings on the proposed ordinance.  [ECF No. 30-1 at 32–45, 46–57, 250–63].  At the end of the final hearing, the Board adopted the resolution.  Given this democratic process, Summit must show it is "likely to prevail on the merits" to be entitled to a preliminary injunction.  *Rounds*, 530 F.3d at 732

ii.  Statutory Interpretation Under Iowa Law

"A trial court's determination of whether a local ordinance is preempted by state law is a matter of statutory construction." *City of Sioux City v. Jacobsma*, 862 N.W.2d 335, 339 (Iowa 2015) (quoting *City of Davenport v. Seymour*, 755 N.W.2d 533, 537 (Iowa 2008)).  "In construing statutes, [the] goal is to ascertain legislative intent." *Mall Real Estate, L.L.C v. City of Hamburg*, 818 N.W.2d 190, 194 (Iowa 2012) (citation omitted).  "In ascertaining legislative intent, we consider the language used in the statute, the object sought to be accomplished, and the wrong to be remedied." *Swainston v. Am. Fam. Mut. Ins. Co.*, 774 N.W.2d 478, 482 (Iowa 2009) (quoting *Mortenson v. Heritage Mut. Ins. Co.*, 590 N.W.2d 35, 39 (Iowa 1999)).  "We consider all parts of

an enactment together and do not place undue importance on any single or isolated portion." *Id.*

"In the context of state-local preemption, the silence of the legislature is not prohibitory but

permissive." *Bellino Fireworks, Inc. v. City of Ankeny, Iowa*, No. 4:17-cv-212-RGE-CFB, 2017

WL 11446135, at *6 (S.D. Iowa June 29, 2017) (quoting *Seymour*, 755 N.W.2d at 543).

### iii.  Iowa State Law Claims

Summit argues that two provisions of the Ordinance are preempted by Iowa Code § 479B.

[ECF No. 26].  Specifically, it contends the distance and permitting components are unenforceable

because Iowa Code § 479B delegates exclusive authority to the IUB.  *Id.* at 14–16.  Defendants

respond that the Ordinance is not preempted because Iowa Code § 479B does not limit their ability

to engage in ordinary zoning.  [ECF No. 33 at 9–10].  The Court agrees that Summit is likely to

prevail in its claim that the Ordinance cannot be enforced because of implied preemption.

### a.  Distance and Siting Requirements – Express Preemption

The first question is whether the Ordinance's distance and siting requirements are expressly

preempted by Iowa Code § 479B.  The Court finds that they are not.

Under the statute, a pipeline company seeking a permit must conduct meetings where it

provides the public "[a] map showing the route or location of the proposed project."  Iowa Code

§ 479B.4(5)(a)(5).  When a pipeline company applies for a permit with the IUB, it must furnish

"[a] legal description of the route of the proposed pipeline and a map of the route."  Iowa Code

§ 479B.5(3).  An application must include "[m]aps showing the location of proposed machinery,

appliances, fixtures, wells, and stations necessary for the construction, maintenance, and operation

of the hazardous liquid storage facilities."  Iowa Code § 479B.5(5)(b).  "The board may examine

the proposed route of the pipeline and location of the underground storage facility" at a hearing.

Iowa Code § 479B.8.  The IUB "may grant a permit in whole or in part upon terms conditions and

restrictions as to location and route as it determines to be just and proper."  Iowa Code § 479B.9.

After issuance of a permit, the Board is directed to "keep a record . . . showing . . . the location and

route of the pipeline."  Iowa Code § 479B.14(5).

This statutory language does not expressly assign a role to counties when determining the

location of a pipeline.  It also does not expressly provide that counties have no role in the process.

This means there is no "specific language used by the legislature" to explain how the Court should

resolve the dispute.  *Seymour*, 755 N.W.2d at 538 ("the specific language used by the legislature

ordinarily provides the courts with the tools necessary to resolve any remaining . . . problems in

statutory interpretation.").  Without a direct and specific prohibition by the Iowa Legislature, there

can be no express preemption of "local action in an area."  *Goodell*, 575 N.W.2d at 493 (citing

*Chelsea Theater*, 258 N.W.2d at 373).  In short, Iowa Code § 479B does not expressly preempt

the distancing and siting requirements of the Ordinance.

b.  Distance and Siting Requirements – Implied Preemption

After concluding the Ordinance's distance requirements are not expressly preempted by

Iowa Code § 479B, the next issue is whether the provisions are nonetheless preempted by

implication.  The Court finds they are.

The Ordinance imposes many limitations on the placement of a hazardous liquid pipeline.

It requires Summit to place a pipeline more than two miles from the "limits of an incorporated

city" and more than half a mile from any "church, school, nursing home, long-term care facility,

or hospital."  [ECF No. 26-2 at 11].  A proposed pipeline would have to be at least a quarter of a

mile from public parks or recreation areas.  *Id.*  The pipeline must be one thousand feet from "any

occupied structure."  *Id.*  An occupied structure is defined as "a building or structure that has been

inhabited or used for residential, commercial, industrial, or agricultural purposes at any time during

the twelve (12) months" before a conditional use permit application.  *Id.* at 7.  In addition, a pipeline must be at least one thousand feet from a confined animal feeding operation or facility, an electric generating facility, an electric transmission line, an electric transmission substation, a public drinking water treatment plant, or a public wastewater treatment plant.  *Id.*

Common sense suggests these restrictions would eliminate all or almost all land in Shelby County on which an IUB approved pipeline could be built.  This creates a serious possibility the IUB would approve the construction of the pipeline but Summit would be unable to build because it could not comply with the requirements of the Ordinance.  Put another way, the Ordinance would prohibit "an act permitted by statute."  *Gruen*, 457 N.W.2d at 342.  This situation is the one that preemption is designed to avoid; so long as the situation exists, the Ordinance is unenforceable under implied preemption.  *Seymour*, 755 N.W.2d at 538 (citation omitted).

Other portions of the statute support this interpretation.  Specifically, the statute directly assigns a role to the county boards of supervisors in some provisions but not in others.  A notable example is the land restoration provisions, which requires a board of supervisors to consider certain topics, hire a professional engineer, and conduct detailed inspections.  Iowa Code § 479B.20.  This stands in sharp contrast to the location provisions of the statute, which do not mention counties.  Iowa Code §§ 479B.8, 479B.9.  This omission is evidence that the Legislature did not envision a role for counties in regulating the location of pipelines.  *State of Iowa v. Beach*, 630 N.W.2d 598, 600 (Iowa 2001) ("the express mention of one thing implies the exclusion of other things not specifically mentioned"); *Marcus v. Young*, 538 N.W.2d 285, 289 (Iowa 1995) (same).

Pursuant to the above discussion, the Court concludes the distance and siting requirements in Art. 8.4 of the Ordinance, are implicitly preempted by Iowa Code § 479B.

c.   Pipeline Company Permitting Requirement

The parties contest whether the Ordinance's permitting requirements as related to pipeline facilities are preempted by the permitting provisions of Iowa Code § 479B.  For the reasons discussed below, these permitting provisions are impliedly preempted by Iowa Code § 479B.

Iowa law provides that "[a] pipeline company doing business in the state shall file a verified petition with the board asking for a permit to construct, maintain, and operate a new pipeline along, over, or across the public or private highways, grounds, waters, and streams . . . in this state."  Iowa Code § 479B.4(1).  The petition must include information about the company filing the application, a legal description of the pipeline, locations of storage facilities, alternative routes, and potential interactions with "present and future land use and zoning ordinances."  Iowa Code § 479B.5.  The IUB "may grant a permit in whole or in part upon terms, conditions, and restrictions as to location and route as it determines to be just and proper."  Iowa Code § 479B.9.

The Ordinance provides that a pipeline company seeking to "construct, maintain, or operate a new Pipeline . . . in th[e] County shall submit an Application to the County Zoning Administrator for a conditional use permit."  [ECF No. 26-2 at 10].  The company must include its complete IUB application, maps identifying impacted county residents, and dimensions of the pipeline.  *Id.*  The application must furnish information on compliance with abandonment and removal requirements, an emergency response and hazard mitigation plan, the written template a company will use to negotiate easements with landowners, and fees for a conditional use permit.  *Id.* at 11–12.  It also implements a lengthy public hearing and decision making process.  *Id.* at 13.

As explained earlier, the law does not expressly preempt county regulations of pipelines. Rather, the Iowa Code preempts the Ordinance to the extent it interferes with the construction of an IUB-approved pipeline.  The permitting provision of the Ordinance interferes with the IUB's

authority because it requires companies to submit an extensive application for a county permit after submission of a petition to the IUB.  [ECF No. 26-2 at 9].  The purpose for this process, by Defendants' own admission, is to change the route of the pipeline during or after the IUB process.  This will lead to a situation where the IUB may grant a permit to construct a pipeline and Summit is unable to do so.  Where compliance with state law is not possible because of a local ordinance, the local law is unenforceable under preemption.  *Seymour*, 755 N.W.2d at 538.

This conclusion is supported by the implementing regulations of Iowa Code § 479B.  Iowa. Admin. Code Reg. 199-13.3(479B).  Under these regulations, pipeline companies must seek and receive permission from numerous entities and submit this information with their application for a petition.  Iowa Admin. Code Reg. 199-13.3(1)(e).  They must obtain consent from "appropriate public highway authorities, or railroad companies" who would be affected by the pipeline.  Iowa Admin. Code Reg. 199-13.3(1)(e)(1).  They shall list and acquire any permits required by "federal agencies" or "state agencies."  Iowa Admin. Code Reg. 199-13.3(1)(e)(3–4).  The regulations do not mention permits from local municipalities as being required for consideration for building a pipeline.  Put another way, the exclusion of municipalities from these regulations suggests that they were intended to not have a role in the permitting process.

Given this discussion of Iowa law and implementing regulations, the Court concludes the conditional use permit requirements in the Ordinance related to pipeline companies, *i.e.*, Arts. 8.3, 8.5, 8.7, and 8.8., are preempted by Iowa Code § 479B.

### d.  Landowner Permitting Requirement

The parties also disagree on whether landowner permitting requirements are permissible in light of Iowa Code §§ 6B.2B, 479B.  For many of the same reasons discussed in the preceding section, the landowner requirements cannot be enforced due to implied preemption.

Iowa law requires an agency or an individual acting with agency approval "make a good faith effort to negotiate with the owner to purchase [] private property or property interest before filing an application for condemnation." Iowa Code § 6B.2B. Administrative regulations require good faith effort to negotiate easements with landowners prior to constructing any pipelines. Iowa Admin. Code Reg. 199-10.3(1)(k)(2) (the applicant must identify "when the easement negotiations will be completed."). Once a permit is issued by the IUB, the pipeline company "shall be vested with the right of eminent domain." Iowa Code § 479B.16.

The Ordinance requires a landowner who "intends to negotiate or sell an easement to a Pipeline Company by means of an Independent Agreement [to] submit an application to the County Zoning Administrator for a conditional use permit." [ECF No. 26-2 at 10]. They must provide a "copy of the Independent Agreement the Property Owner proposes to execute with the Pipeline Company, including a map and a legal description of the proposed Line Location, and a statement of verification of compliance with the separation requirements." *Id*. The approval process for landowners is substantially the same as the one for pipeline companies; the primary difference is landowner approvals are not subject to a public hearing. *Id*. Only after receiving approval from Shelby County may the landowner sign the agreement. *Id.* at 10.

The statute preempts the Ordinance to the extent it restricts Summit's ability to negotiate easements with landowners. The County's permitting application, which prohibits consummation of an Independent Agreement without a conditional use permit, has already been used as the basis to send threatening letters to landowners in Shelby County. [ECF No. 26-3 at 1–50]. Attempted enforcement of the provisions has stymied attempts by Summit to negotiate with landowners, as

well as interrupted its relationships with current landowners.  [ECF No. 50 at 14].  To the extent the Ordinance's conditional use permit regime impacts this negotiation process, it is preempted.[5]

In light of Iowa law, the conditional use permit requirements in the Ordinance related to landowners, *i.e.*, Arts. 8.3, 8.6, and 8.7, are preempted by Iowa Code § 479B.

### e.   Summary

For the reasons above, Arts. 8.3, 8.4, 8.5, 8.6, 8.7., 8.8. 8.9., and 8.10 of the Ordinance are preempted by state law.  Accordingly, Defendants will be enjoined from enforcing them.

### iv.  Statutory Interpretation Under Federal Law

Statutory analysis begins "with the plain language of the statute."  *Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.*, 651 F.3d 857, 862 (8th Cir. 2011) (citing *United States v. I.L.*, 651 F.3d 817, 820 (8th Cir. 2011)).  The main question is "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute."  *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  *Robinson*, 519 U.S. at 341.  The inquiry ends if "the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'"  *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) (quoting *Barnhart*, 534 U.S. at 450).

---

[5] The Ordinance's landowner permit process is also irrelevant once the IUB issues a permit to Summit.  This is because the permit's issuance vests Summit with the power of eminent domain. Iowa Code § 479B.16.  Once Summit has the power of eminent domain, it may exercise the power to claim the land regardless of the permit necessary under the Ordinance.  The Ordinance could not prohibit Summit from engaging in this activity under preemption.  *Seymour*, 755 N.W.2d at 538 (citing *Goodell*, 575 N.W.2d at 493).

v.   Federal Law Preemption Claims

Summit alleges that two provisions of the Ordinance are preempted by federal law.  [ECF No. 26].  It claims that the hazard and safety plan requirements of the Ordinance, as well as the abandonment and discontinuance provisions, are unenforceable because of the PSA.  *Id.* at 19–23. Defendants respond that the Ordinance is not preempted by the PSA because the statute governs safety standards, not zoning.  For the reasons discussed below, Summit is likely to prevail in its claim that portions of the Ordinance are preempted by the PSA and its implementing regulations.

a.   Hazard Safety Plan

The parties sharply contest the scope of the PSA's impact on hazard safety, most notably on whether the PSA expressly preempts the Ordinance's requirements.  The Court finds it does.

The PSA provides, "[a] [s]tate authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."  49 U.S.C. § 60104(c).  The statute delegates sole authority to enact safety provisions to the PHMSA.  49 U.S.C. § 60102(a)(2). The standards cover "the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities."  49 U.S.C. § 60102(a)(2)(B).  Using this authority, the PHMSA requires companies to implement a manual describing its process for responding to "emergencies."  49 C.F.R. § 195.402.  The companies must have certain materials on hand, the ability to provide an effective response to different types of emergencies, and have an emergency shut-off valve.  49 C.F.R. § 195.402(e)(2–4).  The safety procedures must include steps to control the release of materials during "an accident" and minimize "public exposure to injury."  49 C.F.R. § 195.402(e)(5–6).

The Ordinance requires a pipeline company to submit "a plan that meets the requirements of this section."  [ECF No. 26-2 at 14].  The plan must list a description of health and safety risks

of the pipeline to animals and humans, the time it would take for injuries to occur, calculations and

models about worst-case scenarios, and a list of facilities and structures that could be harmed.  *Id.*

A company must submit "[a]ll information needed by county first responders, emergency response

personnel, and law enforcement personnel in order to engage in local emergency management and

hazard response."  *Id.* at 15.  The owner is required to provide "a Mass Notification and Emergency

Messaging System [and] evacuation plans."  *Id.*

The statute provides the Secretary of Transportation with the authority to enact emergency

response and hazard mitigation plans.  49 U.S.C. § 60102(a)(2)(B).  This authority is limited solely

by the statute, which provides a framework for the regulations.  49 U.S.C. § 60102(r).  Courts have

understood the statute to provide the Secretary with "exclusive authority to regulate the safety . . .

of interstate hazardous liquid pipelines."  *Kinley Corp.*, 999 F.2d at 359.  This language precludes

states and municipalities "from regulating in any manner whatsoever with respect to the safety of

. . . facilities."  *ANR Pipeline Co.*, 828 F.2d at 470.  In light of this, the Court concludes that express

preemption invalidates the Ordinance's emergency response and hazard mitigation provisions.

Therefore, Art. 8.11 of the Ordinance may not be enforced.

### b.   Abandonment and Discontinuation

The parties next disagree on whether the abandonment and discontinuation provisions of

the Ordinance are expressly preempted.  As noted below, these provisions are wholly preempted.

The PSA delegates authority to enact safety provisions to the Secretary of Transportation.

49 U.S.C. § 60102(a)(2).  The PHMSA regulates abandonment of pipelines under this authority.

49 C.F.R. § 195.402(c)(10).  Specifically, a pipeline company must have a plan for "[a]bandoning

pipeline facilities" that includes "safe disconnection from an operating pipeline system," the

"purging of combustibles," and "sealing abandoned facilities . . . to minimize safety and

environmental" issues.  *Id.*  They must provide a report to the Secretary establishing its compliance with the statutory and regulatory provisions.  49 U.S.C. § 60108(b)(6)(A).

By contrast, the Ordinance requires a pipeline owner to "notify the County" of its intent to discontinue the use of the pipeline.  [ECF No. 26-2 at 16].  Once the abandonment process begins, a pipeline owner "shall offer to each Property Owner the option to have the Pipeline and all related facilities physically dismantled and removed, including both the below and above ground facilities."  *Id.*  Removal must be completed within one-hundred and eighty days of "abandonment or discontinuation."  *Id.*  Lastly, the pipeline owner is directly responsible for the costs of removal and following the restoration requirements of Iowa Code § 479B.20.  *Id.*

The statute provides the Secretary with authority to promulgate regulations on construction and maintenance of pipelines and their termination.  49 U.S.C. § 60102(a)(2)(B).  The regulations require the companies to implement procedures on the abandonment of pipelines.  49 C.F.R. § 195.402(c)(10).  The statute provides an exclusive grant of authority to the Secretary, which means that state and local agencies cannot regulate safety matters.  *Kinley Corp.*, 999 F.2d at 359. This means that the Ordinance's abandonment requirements are expressly preempted by the PSA and Art. 8.12 of the Ordinance may not be enforced.

### vi. Summary

For the reasons discussed above, Summit has shown that the first element of the *Dataphase* factors – success on the merits – weighs in favor of a preliminary injunction.

### B.  Irreparable Injury

Summit asserts several theories of irreparable injury.  First, Summit claims the Court can simply presume irreparable injury.  [ECF No. 26 at 24–25].  Second, it asserts it would suffer an irreparable injury because the Ordinance would prevent it from exercising its legal right to acquire

easements and complete the pipeline project. *Id.* Third, it maintains it would face irreparable injury because of unrecoverable costs, loss of goodwill, and confusion about the project. *Id.* at 25. Defendants resist, explaining each of the irreparable injuries is insufficient under current doctrine. [ECF No. 33 at 31–34]. Summit has sufficiently shown this element for the purpose of preliminary relief.

### i.   Governing Law

The first factor requires a moving party to show they will suffer an irreparable harm if the preliminary injunction is not granted. *Gen. Motors Corp. v. Harry Brown's, LLC,* 563 F.3d 312, 318–19 (8th Cir. 2009) (citing *Dataphase,* 640 F.2d at 113). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citation omitted). "A party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996). A "theoretical possibility" of future harm is not sufficient to warrant relief. *McFarlin v. Newport Special Sch. Dist.,* 980 F.2d 1208, 1211 (8th Cir. 1992). There must be no alternative to besides a preliminary injunction. *CDI Energy Servs. v. W. River Pumps, Inc.,* 567 F.3d 398, 403 (8th Cir. 2009).

### ii.   Presuming Irreparable Injury

Summit asserts that the Court may presume irreparable injury in cases where a plaintiff is likely to succeed on the merits. [ECF No. 26 at 23]. In support of this position, Summit highlights two separate cases finding irreparable injury in the context of geophysical activities or pipelines. *See Glob. Geophysical Servs., Inc. v. Kuster*, No. 4:15-cv-16, 2015 WL 570918, at *4 (D. N.D. Feb. 11, 2015) (citing *Calvin Klein*, 815 F.2d. at 505); *Paradigm Energy Partners, LLC v. Fox,* Case No.: 1:16-cv-304, 2016 WL 8737873, at *5 (D. N.D. Aug. 23, 2016) (citation omitted).

Contrary to the broad interpretation of irreparable injury provided by these cases, the *Calvin Klein* decision limits this presumption of irreparable injury in trademark disputes under the Lanham Act. *Calvin Klein*, 815 F.2d at 505 (citing *Black Hills Jewelry Mfg. Co. v. Goldrush, Inc.*, 633 F.2d 746, 753 (8th Cir. 1980)).  This presumption has a lengthy history in federal courts, but "it is unclear whether [it] . . . survived more recent Supreme Court opinions emphasizing the movant's burden to show that 'irreparable injury is likely in the absence of an injunction.'"  *Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1009 (8th Cir.  2019) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  Given this presumption is limited to trademark disputes and it may not longer be good law, the Court declines to rely upon it.  The Court turns to address the sufficiency of the other harms.

### iii.  Legal Right to Complete the Pipeline Project

Summit alleges that the Ordinance causes irreparable harm because the Ordinance prevents Summit from "exercising its legal right to acquire easements and to complete its pipeline project." [ECF No. 26 at 24].  This argument is foreclosed by statute.  This is because Iowa Code § 479B.3 provides that a pipeline may not be built until the IUB application process is complete and Summit receives a permit.  Iowa Code § 479B.3 ("A pipeline company shall not construct, maintain, or operate a pipeline or underground storage facility . . . except in accordance with this chapter.").  Until Summit receives its permit from the IUB, it does not have a right of construction that could be injured by the Ordinance, let alone irreparably injured.  This is not enough.

### iv.  Loss of Goodwill

Summit claims the Ordinance causes irreparable harm because the Ordinance caused it to experience significant harm to its goodwill.  [ECF No. 26 at 24].  This argument is insufficient.

"Loss of intangible assets such as reputation and goodwill can constitute irreparable injury." *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) (citing *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir. 1987)). This includes goodwill among "employees and customers." *Mgmt. Registry, Inc. v. A.W. Cos., Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2019). A party must provide sufficient "evidence or analysis to support [the contention]," not mere allegations. *Id.* (citing *Iowa Utils. Bd.*, 109 F.3d at 426). Specifically, a movant must present enough evidence to "establish that the risk of harm is so 'certain and great and of such imminence' as to require preliminary injunctive relief." *Allied Servs., LLC v. Smash My Trash, LLC*, Case No. 21-cv-00249-SRB, 2021 WL 1671675, at *4 (W.D. Mo. Apr. 28, 2021) (quoting *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013)).

Summit explains it has "earned reputation and goodwill" through its process of voluntarily securing land use agreements and easements from sixty-five percent of Iowans along the proposed pipeline project. [ECF Nos. 26 at 26; 26-2 at 5]. Summit stated it received several "panicked calls from landowners" upon receiving letters from the County. [ECF No. 50 at 13]. The individuals allegedly asked Summit "[w]hat are you going to do about it? How can you help me with this?" *Id.* at 14. The Court cannot say these general conversations, which were unsupported by evidence such as affidavits or testimony, are sufficient to show there is irreparable injury to the goodwill of Summit. *Mgmt. Registry,* 920 F.3d at 1183. Nor does it show the harm is "of such imminence" to support preliminary relief. *Allied Servs.*, 2016 WL 1671675, at *4 (quotation omitted). Given this lack of support, Summit has not shown that this harm supports a finding of irreparable injury.

v.   Unrecoverable Costs

Summit contends that the Ordinance inflicts numerous financial costs that include a loss of a competitive advantage, the loss in the value of future profits caused by delays, and the loss of

third-party contracts.  [ECF No. 26 at 26].  Defendants respond that the Ordinance "may require changes to Summit's proposed route" but the evidence does not support a conclusion that it is entitled to a route of its choice.  These injuries are sufficient to establish irreparable injury.

As a general rule, economic loss "does not, in and of itself, constitute irreparable harm . . . because the party . . . can receive full compensation through monetary damages."  *Breadeaux's Pisa, LLC v. Beckman Bros. Ltd.*, 599 F. Supp. 3d 826, 830 (W.D. Mo. 2022) (quoting *Iowa Utils. Bd.*, 109 F.3d at 426).  This is particularly true when economic "losses are quantifiable."  *Mgmt. Registry*, 920 F.3d at 1183.  An exception to the rule applies when the losses are not recoverable. *DISH Network Serv. L.L.C. v. Laducer*, 725 F.3d 877, 882 (8th Cir. 2013) (citing *Iowa Utils. Bd.*, 109 F.3d at 426) ("Economic loss, on its own, is not an irreparable injury so long as the losses can be recovered.").

At oral argument, Summit noted that the lost profits, lost opportunities, delay, and loss of third-party contracts would be an "existential threat" to the project.  [ECF No. 50 at 13].  Although the loss was difficult to estimate, Summit explained the loss could range from hundreds of millions to billions of dollars.  *Id.*  When the Court asked Shelby County whether it had "the ability to pay hundreds of millions of dollars in damages," Defendants responded with a generic "[t]hey do have that ability to satisfy a judgment through a tax levy."  *Id.* at 39.  The Court asked again, wondering "do you think the people of Shelby County have the ability to pay millions of dollars in damages [through a levy]?"  *Id.* at 40.  Counsel responded, "I can't answer that."  *Id.*  This discussion led the Court to posit "[t]he practical answer is no" because "[i]t's uncollectible, right?"  *Id.*

The record supports several factual findings.  First, the potential loss is significant, ranging from tens of millions of dollars to hundreds of millions of dollars and maybe more.  [ECF No. 50 at 13].  Second, the amount cannot be quantified outside of this range because of factors that are

unknowable such as the extent of delay that would occur if the Ordinance were upheld. *Id.* Third, Shelby County would not have the ability to pay a monetary judgment because it is a small county with insufficient ability to raise this amount through taxes. *Id.* at 40. These facts lead the Court to conclude that the exception to the rule on economic loss, where irreparable injury can be found when the amount of loss is not quantifiable and impossible to recover, applies to this case. *DISH Network Serv.*, 725 F.3d at 882; *Mgmt. Registry*, 920 F.3d at 1183. Accordingly, the irreparable injury element has been met.

### C. Merged Factors

Summit maintains the third and fourth factors support a preliminary injunction because continued enforcement would be harmful and "Shelby County . . . can suffer no harm" from being allowed to not enforce an invalid law. [ECF No. 26 at 27]. It explains Shelby County has a proper avenue to address its concerns: the IUB hearing process. *Id.* at 27. Defendants respond that both factors "weigh in favor of the County" because the "proposed carbon capture pipeline poses health and economic risks to residents of the County." [ECF No. 33 at 35]. For the reasons discussed below, these factors weigh in favor of the preliminary injunction.

On the first part of the merged factors, balance of the equities, the inquiry requires a court to "weigh 'the threat of irreparable harm' shown by the movant against 'the injury that granting the injunction will inflict on other parties.'" *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) (quoting *Dataphase Sys.*, 640 F.2d at 113). "This factor requires the examination of the harm granting or denying the injunction poses to both parties to the dispute, as well as other interested parties." *Johnson v. Moody*, No. 4:16-cv-00449-RGE-SBJ, 2016 WL 8839427, at *9 (S.D. Iowa Nov. 14, 2016) (citing *Dataphase*, 640 F.2d at 114).

On the second element, public interest, the court must balance "the specific public interests that might be harmed and what public interests might be served." *Rodriguez v. Molina*, 608 F. Supp. 3d 791, 801 (S.D. Iowa 2022) (citing *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 997 (8th Cir. 2011)). Preliminary relief will only be granted when the benefits of granting the injunction outweigh the specific harms. *Id.* (citation omitted).

With respect to the equities, the strongest equity in favor of a preliminary injunction is the full enforcement of valid federal and state laws. *Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905, 909 (8th Cir. 2020) ("It is in the public interest to uphold the will of the people, as expressed by acts of the state legislature, when such acts appear harmonious with the Constitution."). This equity favors the preliminary injunction because the Ordinance attempts to circumvent properly enacted federal and state laws that regulate pipeline safety. In comparison, Defendants lack a meaningful equity in attempting to enforce a patently preempted ordinance.

On public interest, the strongest interest in favor of Summit is the loss of an enormous sum of money. This amount, which ranges from hundreds of millions to billions of dollars, is hard to define and will be impossible to recover. [ECF No. 50 at 14]. Another strong interest is a potential reduction in carbon emissions because of the pipelines. [ECF No. 47-2 at 1]. The strongest interests in favor of Defendants are safety concerns. While the safety concerns are genuinely held, these concerns must be expressed through the appropriate political process, *i.e.,* engaging the IUB, the Iowa Legislature, and the United States Congress. They do not have an interest in enforcing invalid laws, particularly when they Defendants have yet to produce information on why the aforementioned avenues are insufficient to address their concerns. Upon balancing these interests, this element supports Summit. Defendants may not pass unenforceable ordinances in a roundabout attempt to undermine valid federal and state laws.

Accordingly, the Court concludes that this merged third element shows that Summit would suffer more harm than Defendants if the preliminary injunction were not granted.  In short, this merged factor weighs in favor of granting the preliminary injunction.

VI.     CONCLUSION

For the reasons above, Plaintiffs' Motion for a Preliminary Injunction is **GRANTED**.

VII.     SCOPE OF PRELIMINARY INJUNCTION

Under Federal Rule of Civil Procedure 65(d), every order granting an injunction " must . . . state its terms specifically . . . and describe in reasonable detail . . . the act or acts restrained."  Fed. R. Civ. P. 65(d)(1)(B–C).  The scope of the preliminary injunction is defined as follows:

1. **IT IS ORDERED** that Defendants Shelby County, Iowa, the Shelby County Board of Supervisors, and each of the Supervisors in their official capacities are enjoined from enforcement of Shelby County Ordinance No. 2022-4 effective immediately.  They may not enforce Arts. 8.3, 8.4., 8.5. 8.6., 8.7., 8.8., 8.9., 8.10., 8.11., or 8.12 of the law in any capacity or through any instrumentality available to them.
2. **IT IS FURTHER ORDERED** that Defendants shall immediately issue a written notice to all employees in the County who are involved in enforcing Ordinance No. 2022-04 or have oversight of such enforcement and notify them of the injunction prohibiting enforcement of the Ordinance.
3. **IT IS FURTHER ORDERED** that Defendants shall demonstrate its compliance with the Order by submitting an affidavit detailing its efforts to the Court within ten (10) days of entry of this Order.

IT IS SO ORDERED.

Dated this 10th day of July, 2023.

_____
STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT