**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| SUMMIT CARBON SOLUTIONS, LLC, | CASE NO. 1:22-cv-20 |
| Plaintiff, | |
| v. | **DEFENDANTS' SUPPLEMENTAL** |
| | **APPENDIX IN SUPPORT OF THEIR** |
| SHELBY COUNTY, IOWA; SHELBY | **MOTION FOR SUMMARY** |
| COUNTY BOARD OF SUPERVISORS; | **JUDGMENT (ECF NO. 59) AND** |
| STEVE KENKEL, in his official capacity as a | **RESISTANCE TO PLAINTIFF'S** |
| Shelby County Supervisor; CHARLES | **MOTION FOR SUMMARY** |
| PARKHURST, in his official capacity as | **JUDGMENT (ECF NO. 68)** |
| Shelby County Supervisor; DARIN HAAKE, | |
| in his official capacity as Shelby County | |
| Supervisor, | |
| Defendants. | |

Defendants Shelby County, Iowa, Shelby County Board of Supervisors, Steve Kenkel, Charles Parkhurst, and Darin Haake (collectively "the County"), submit the following Supplemental Appendix in Support of their Motion for Summary Judgment (ECF No. 5) and Resistance to Plaintiff's Motion for Summary Judgment (ECF No. 68).

## TABLE OF CONTENTS

1. South Dakota Public Utility Commission's Order Denying Summit's Application ................................................................................. SUPPAPP 3-4

2. Summit's Response to Motion to Dismiss in South Dakota ........................... SUPP APP 5-6

3. Iowa Capital Dispatch Article (10.3.23) .......................................... SUPP APP 7-9

4. Summit Powell Rebuttal Testimony................................................. SUPP APP 10-15

5. PHMSA Letter to Summit........................................................... SUPP APP 16-19

6. Summit Dillon Rebuttal Exhibit 2................................................. SUPP APP 20-58

7. Excerpt of Powell Testimony from IUB Hearing .................................. SUPP APP 59-67

                                          */s/ Jason M. Craig*
                                          Jason M. Craig (AT0001707)
                                          Emily A. Kolbe (AT0012313)
                                          AHLERS & COONEY, P.C.
                                          100 Court Avenue, Suite 600
                                          Des Moines, Iowa 50309-2231
                                          Telephone: (515) 243-7611
                                          Facsimile: (515) 243-2149
                                          Email: jcraig@ahlerslaw.com
                                                 ekolbe@ahlerslaw.com
                                          ATTORNEYS FOR DEFENDANTS

**Electronically filed and served:**

Bret A. Dublinske
Brant M. Leonard
Kristy Dahl Rogers
FREDRIKSON & BYRON, P.A.
111 East Grand Ave., Suite 301
Des Moines, IA 50309
bdublinske@fredlaw.com
bleonard@fredlaw.com
krogers@fredlaw.com

Brian D. Boone
Michael R. Hoernlein
ALSTON & BIRD LLP
101 S. Tyron St., Ste. 4000
Charlotte, NC 28280
brian.boone@alston.com
michael.hoernlein@alston.com

Karla M. Doe
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309
karla.doe@alston.com
ATTORNEYS FOR PLAINTIFFS

02263725-1\22102-021

| CERTIFICATE OF SERVICE |
|---|
| The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on:    October 10, 2023 |

| By: | ☐ | U.S. Mail | ☐ | Fax |
|---|---|---|---|---|
| | ☐ | Hand delivery | ☐ | Private Carrier |
| | ☒ | Electronically (*via CM-ECF*) | ☐ | E-mail |

Signature:    */s/ Jason M. Craig*

**SUPP APP 2**

# BEFORE THE PUBLIC UTILITIES COMMISSION
## OF THE STATE OF SOUTH DAKOTA

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION BY SCS CARBON TRANSPORT LLC FOR A PERMIT TO CONSTRUCT A CARBON DIOXIDE TRANSMISSION PIPELINE | )<br>)<br>)<br>)<br>)<br>) | ORDER GRANTING MOTION TO DENY APPLICATION OF SCS CARBON TRANSPORT LLC<br><br>HP22-001 |

On February 7, 2022, the South Dakota Public Utilities Commission (Commission) received an Application for a Permit to Construct a Carbon Dioxide Transmission Pipeline (Application) from SCS Carbon Transport LLC (Applicant or SCS), a limited liability company owned by Summit Carbon Solutions, LLC. Applicant proposes to construct and operate a carbon dioxide ($CO_2$) transmission pipeline (Project). The Project is approximately 2,000 miles of pipelines for the transportation of $CO_2$ from more than 30 ethanol plants across five states, including seven ethanol plants in South Dakota, to underground injection control facilities in North Dakota. The proposed route of the main line enters South Dakota in Lincoln County at the Iowa/South Dakota border and extends in a northwesterly direction, exiting the state at the South Dakota/North Dakota border in McPherson County. In addition to the main line, the proposed Project includes lateral and trunk lines connecting ethanol plants to the main line. The proposed length of pipelines through South Dakota is approximately 477 miles and would cross the counties of Beadle, Brown, Clark, Codington, Edmunds, Hamlin, Hand, Hyde, Kingsbury, Lake, Lincoln, McCook, McPherson, Minnehaha, Miner, Spink, Sully, and Turner.

On February 9, 2022, Vice Chairperson Kristie Fiegen filed a letter delivered to Governor Kristi Noem advising of a conflict of interest under SDCL 49-1-9 after learning of family ownership of land on the proposed Project route. On February 10, 2022, the Commission issued a Notice of Application; Order for and Notice of Public Input Meetings; Notice of Opportunity to Apply for Party Status. Pursuant to ARSD 20:10:22:40, the deadline for persons to file an application for party status was April 8, 2022. On February 16, 2022, Josh Haeder, State Treasurer, was appointed by Governor Noem to serve as an Acting Commissioner in this docket. On February 24, 2022, the Commission issued an Order Assessing Filing Fee; Order Authorizing Executive Director to Enter into Consulting Contracts. Public input meetings were held March 22 through March 25, 2022, at various locations in the Project's footprint. Party status has been granted to numerous individuals and entities.

On August 14, 2023, the Commission issued an Order for and Notice of Evidentiary Hearing, noticing the evidentiary hearing in this docket to commence on September 11, 2023.

On August 18, 2023, intervenors represented by attorney Brian Jorde (Landowners) filed Landowners' Motion to Return Application. In the Motion to Return Application, Landowners request the Commission return the Application pursuant to SDCL 49-41B-13(1). Following a hearing on the motion, the Landowners' Motion to Return Application was denied.

On August 21, 2023, SCS filed a Motion for Order Preempting County Ordinances. By a filing made on September 7, 2023, SCS withdrew its Motion for Order Preempting County Ordinances. In response to the withdrawal of SCS's, Commission Staff filed a Motion to Deny Application on September 8, 2023. In its Motion to Deny Application, Commission Staff argued

that because SCS was no longer requesting preemption and the proposed route violated county ordinances in four South Dakota counties, SCS's permit must be denied as a matter of law based on the applicant's burden of proof set forth in SDCL 49-41B-22(1) and the requirement that no route shall be designated that violates local ordinances without preemption pursuant to SDCL 49-41B-28. Commission Staff cited to material misstatements contained within the Application regarding SCS's ability to comply with local ordinances and requested the Application be denied without prejudice pursuant to SDCL 49-41B-13(1) and (2). The Motion was joined by Intervenor Landowners represented by Attorney Brian Jorde. On September 8, 2023, SCS filed a Response to Staff Motion to Deny Application. In its response, SCS argued that SDCL 49-41B-22(1) is forward looking, such that the applicant does not necessarily need to have each county permit in hand or be in compliance with local ordinances at the time of the evidentiary hearing.

The Commission has jurisdiction over this matter pursuant to SDCL Chapters 1-26 and 49-41B. As part of the evidentiary hearing in this docket on September 11, 2023, the Commission took up Staff's Motion to Deny Application. After hearing from the parties, the Commission unanimously voted to grant the Motion and Deny the Application pursuant to 49-41B-13. The Commission specifically found that the proposed route violated county ordinances and could not be permitted pursuant to SDCL 49-41B-28, making any representations within the Application that the Applicant would comply with all laws and regulations, including local ordinances, material misstatements of fact.

It is therefore

ORDERED, that the Motion to Deny Application is granted and SCS's Application is denied without prejudice pursuant to SDCL 41-41B-13.

Dated at Pierre, South Dakota, this ___13th___ day of September 2023.

CERTIFICATE OF SERVICE

The undersigned hereby certifies that this document has been served today upon all parties of record in this docket, as listed on the docket service list, electronically.

By: _____

Date: __9/13/23__

(OFFICIAL SEAL)

BY ORDER OF THE COMMISSION:

GARY HANSON, Commissioner

CHRIS NELSON, Commissioner

JOSH HAEDER, Acting Commissioner

2

**SUPP APP 4**

**BEFORE THE PUBLIC UTILITIES COMMISSION**
**OF THE STATE OF SOUTH DAKOTA**

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION BY SCS CARBON TRANSPORT, LLC FOR A PERMIT TO CONSTRUCT A CARBON DIOXIDE PIPELINE | HP22-001 <br><br> RESPONSE TO STAFF MOTION TO DENY APPLICATION |

South Dakota has an outsized role in producing and transporting energy for the entire country, with the production of ethanol and sustainable aviation fuel being a key component of that effort. Much of that fuel is exported to other states, significantly helping South Dakota's economy, but South Dakota is a significant consumer of ethanol and soon to be consumer of sustainable aviation fuel.

Applicant's project will play a significant part of producing that energy, which has statewide benefits. SCS Carbon Transport continues to believe that this Commission should be the ultimate siting authority for this project. That is why SCS requested that this Commission preempt multiple county ordinances that have the intended or unintended effect of hampering projects like this one. Despite that continued belief, SCS heard this Commission loud and clear on Wednesday, September 6 when it ruled unanimously that it will not preempt local county ordinances for CO2 pipelines. For that reason, SCS has withdrawn its motion for preemption.

In response to that withdrawal, Commission Staff has asked the Commission to deny SCS's application outright because SCS's proposed route does not currently comply with local ordinances and SCS does not have waivers and/or county conditional use permits in hand. SCS understands Staff's position but believes that such a drastic outcome is not required by SDCL § 49-41B-22 and that a denial, at this stage of the proceeding, would waste resources that have already been expended on this application.

1

**SUPP APP 5**

SDCL § 49-41B-22(1) provides that to obtain a permit, an applicant must show that the "proposed facility *will* comply with all applicable laws and rules." (emphasis added)  As the South Dakota Supreme Court recently explained, that dictate is "forward looking," such that the applicant does not have to have each county permit in hand or necessarily be compliance with local ordinances at the time of the hearing.  *Christenson v Crowned Ridge Wind, LLC*, 2022 S.D. 46, ¶ 30, 978 N.W.2d 741, 751.  Instead, this Commission can "apply the forward-looking standard of SDCL 49-41B-22(1)" to "attach[] a condition to the permit requiring" that, before construction, the applicant be in compliance with all laws. *Id.* ¶ 33.

That is all SCS is asking for. Because so much effort and so many resources have been expended in preparing the application and for this hearing, SCS asks that the hearing continue that it be given the opportunity to prove the requirements of SDCL § 49-41B-22 and obtain a permit with the condition that it come into compliance with all applicable local ordinances before construction.  If this Commission were to rule otherwise—if it were to hold that an applicant must have each county-level permit in hand before a hearing—then this and future projects may be unnecessarily delayed or terminated.

SCS therefore respectfully requests that the Commission deny Staff's motion and that the hearing continue as scheduled.

Dated this 8th day of September, 2023.

MAY, ADAM, GERDES & THOMPSON LLP

BY: _____
BRETT KOENECKE
CODY L. HONEYWELL
503 South Pierre Street; P.O. Box 160
Pierre, South Dakota 57501-0160
Telephone: (605)224-8803; Fax: (605)224-6289
brett@mayadam.net; cody@mayadam.net

**SUPP APP 6**

Ag + Environment
Carbon Pipeline

# Summit will make new pipeline permit application in South Dakota

### Iowa board grants Navigator CO2's request to pause its permit process

By: Jared Strong - October 3, 2023 4:39 pm



The South Dakota Public Utilities Commission denied Summit Carbon Solutions a pipeline permit in September. (Photo by Joshua Haiar/South Dakota Searchlight)

It could take more than a year for Summit Carbon Solutions to get approval for its proposed carbon dioxide pipeline in South Dakota.

That's because the company, which was denied a pipeline permit by utility regulators in that state last month, will reapply after it identifies a new route that complies with county ordinances.

"Moving forward, we are committed to working with the counties in South Dakota to find a mutually agreeable path through each county," said Sabrina Zenor, a spokesperson for the company. "This means working within ordinances regarding applicability of waivers, etc. and more dynamic conversations around routing."

Summit applied for a permit to construct a carbon dioxide transmission pipeline in that state in February 2022. The South Dakota Public Utilities Commission denied the application about 19 months later in September, citing the route's conflicts with ordinances in four counties.

Summit had asked the commission to overrule those ordinances but withdrew that request after the commission upheld the ordinances in regard to another pipeline proposal by Navigator CO2. That company has since suspended its negotiations for land easements in South Dakota and requested to suspend its permit process in Iowa.

Both companies have sought permission to build multistate pipeline systems to transport captured carbon dioxide from ethanol plants and other facilities. South Dakota is crucial for Summit's proposal because it has eight of the 31 ethanol plants that would connect to Summit's system and because it is a link between North Dakota and most of the remaining plants in Iowa, Minnesota and Nebraska. The company plans to sequester the greenhouse gas underground in North Dakota.

South Dakota law allows counties to adopt restrictions on the pipelines, but state regulators can overrule them if they are "unreasonably restrictive."

The state has four counties — Brown, McPherson, Minnehaha and Spink — that have adopted ordinances that require the pipelines to be certain distances from residences, livestock facilities, nursing homes and other buildings. But they also have exceptions to those restrictions in some cases if county officials and landowners approve of them.

**SUPP APP 7**

"We issue conditional use permits for lots of things that people don't like," said Scott Anderson, director of planning and zoning for Minnehaha County. "I don't think it was the intent of the county commission to set up an ordinance to block anything. … It is a complicated situation with lots of people having strong emotions."

Summit has begun discussions with Minnehaha and other counties to plot a new route. A company representative who spoke to county officials in Brown "basically said, 'We're starting at ground zero, we have to look at it like we don't have a route,'" according to Scott Bader, planning and zoning director for Brown County.

Tracey Millar, zoning administrator for Spink County, said the company is seeking the county's input on its route and has indicated it is moving the pipeline path farther away from people who oppose the project.

A Spink ordinance precludes the pipeline from being built within a half mile of a property line of a residence, but it can be built closer if the owner signs a waiver.

It's unclear when Summit might reapply for a South Dakota permit.

"We plan to refile our application once we have a path through the state," Zenor said.

State law requires the Public Utilities Commission to make a decision about permit requests within a year of the application. Summit's first permit request took longer because the company sought a deadline extension for submitting its evidence and updating its application.

**Company takes different approach in North Dakota**

Summit has renewed its request with North Dakota utility regulators to nullify the effects of two county ordinances that restrict the placement of its proposed carbon dioxide pipeline.

The company recently filed the motion with that state's Public Service Commission, which denied its permit request in August. At that time, the commission did not issue a ruling about the county ordinances because it was denying the permit for other reasons.

The commission has since agreed to reconsider the company's permit request, and Summit wants a ruling on the ordinances before any further hearings are held for the reconsideration.

"This threshold issue will affect the evidence presented in the upcoming hearing by both (Summit) and intervenors, and thus a pre-hearing decision will save both the parties and the commission time and resources," wrote Lawrence Bender, an attorney for Summit.

The company has argued that the Burleigh County and Emmons County ordinances are so restrictive that they prevent any possible pipeline route through them. It further points to part of state law that says: "Except as provided in this section, a permit for the construction of a gas or liquid transmission facility within a designated corridor supersedes and preempts any local land use or zoning regulations."

Opponents of the pipeline route argue that other elements of the law — and the intent of legislators who adopted it — give counties a right to restrict the siting of pipelines. They also say Summit is exaggerating the effects of the ordinances.

It's unclear when state regulators will rule on Summit's request. They have not yet scheduled a new hearing to reconsider the company's proposal, which is being modified to allay some of the concerns about the route.

**Permit hearing continues in Iowa**

An evidentiary hearing for Summit's hazardous liquid pipeline permit request in Iowa began its seventh week on Tuesday with the Iowa Utilities Board.

Landowners who have declined to give Summit land easements to build its pipeline — and who are subject to eminent domain requests — testified about their concerns about the project. That included safety threats posed by pipeline ruptures, damage to farmland, potential inability to get liability insurance and other concerns.

Their testimony was scheduled to continue Wednesday and Thursday.

Also on Tuesday, the IUB granted Navigator's request to suspend its permit proceedings. The company wants to pause its process in Iowa until Illinois utility regulators decide whether to approve the project in that state, which is where Navigator plans to sequester carbon dioxide.

The Sierra Club of Iowa resisted Navigator's request to cancel a meeting next week to discuss the project. The IUB was poised to hold a scheduling conference to help determine a timeline for the remainder of the company's permit process.

The Sierra Club argued the meeting should be used for a public update on the status of the project.

"The landowners impacted by Navigator's project, the public, and for that matter, the board, deserve to know the facts surrounding the status of the Navigator project," wrote Wally Taylor, a Sierra Club attorney. "There has been some indication that Navigator is dropping the portion of its proposed project in South Dakota, and even some portions of the project in northwest Iowa. But Navigator has been less than transparent about the situation."

The IUB denied Taylor's request for the meeting because it "would not provide substantive information."

Republish

Our stories may be republished online or in print under Creative Commons license CC BY-NC-ND 4.0. We ask that you edit only for style or to shorten, provide proper attribution and link to our web site. Please see our republishing guidelines for use of photos and graphics.

**SUPP APP 9**

**STATE OF IOWA**
**IOWA UTILITIES BOARD**

| | |
|---|---|
| IN RE: | DOCKET NO. HLP-2021-0001 |
| SUMMIT CARBON SOLUTIONS, LLC | |

**REBUTTAL TESTIMONY OF**

**JAMES POWELL**

**ON BEHALF OF**

**SUMMIT CARBON SOLUTIONS, LLC**

**AUGUST 21, 2023**

**SUPP APP 10**

1  **Q.   ARE YOU THE SAME JAMES POWELL WHO FILED DIRECT TESTIMONY**
2        **ON MAY 25, 2023?**

3  A.   I am.

4  **Q.   HAVE YOUR EMPLOYER, EMPLOYMENT ADDRESS, OR JOB TITLE**
5        **CHANGED SINCE THAT TESTIMONY?**

6  A.   No they have not.

7  **Q.   WHAT IS THE PURPOSE OF YOUR REBUTTAL TESTIMONY?**

8  A.   The purpose of my rebuttal testimony is to respond to certain issues raised in testimony

9        filed by intervenor and/or OCA witnesses.

10  **Q.   OCA WITNESS SCOTT BENTS' TESTIMONY REQUESTED INFORMATION**
11        **REGARDING SUMMIT'S FINANCIAL ABILITY TO PAY DAMAGES RELATED**
12        **TO OPERATING THE PIPELINE AND SUMMIT'S PLANS FOR HAVING**
13        **INSURANCE COVERAGE IN PLACE.  CAN YOU RESPOND?**
14
15  A.   Yes.  As Mr. Bents mentions in his testimony, Summit has already provided proof of a

16        $250,000 surety bond for the construction and operation of the pipeline in Iowa, which is

17        the amount set by Iowa Code Section 479B.13.  Beyond that, prior to commencing

18        operations, Summit will have in place general liability insurance coverage consistent with

19        best industry practice.  While Summit has not yet finalized its insurance program, it will

20        do so prior to commencing operations and will maintain at least $35 million in general

21        liability insurance coverage for the duration of its operations.  Summit does not object to

22        providing proof of such insurance to the Board prior to commencing operations.

1  Q.   SEVERAL   INTERVENOR   WITNESSES   HAVE   RAISED   CONCERNS
2       REGARDING THE RELEASE THAT OCCURRED ON DENBURY GULF COAST
3       PIPELINE'S   CARBON   DIOXIDE   PIPELINE   IN   FEBRUARY   2020   NEAR
4       SATARTIA,   MISSISSIPPI.     CAN   YOU   DESCRIBE   THE   ACTIONS   THAT
5       SUMMIT HAS TAKEN AND IS TAKING TO AVOID A SIMILAR SITUATION?
6
7  A.   Yes.  On May 26, 2022, the U.S. Department of Transportation's Pipeline and Hazardous

8       Materials Safety Administration ("PHMSA") published its Failure Investigation Report

9       regarding  the Denbury pipeline failure that occurred near Satartia, MS in February 2020

10      (the "PHMSA Report").  The PHMSA Report determined that "[h]eavy rains are believed

11      to have led to a landslide, which created axial strain on the pipeline and resulted in a full

12      circumferential girth weld failure."  The PHMSA Report identified five key contributing

13      factors which gave rise to the pipeline failure and subsequent impacts to people in the

14      Satartia area.  Those five key contributing factors were:

15          (1) Denbury's Operations & Maintenance ("O&M")  procedures did not appear to

16          address the potential for pipeline damage to soil instability despite prior experience

17          with and knowledge of land movement risks;

18          (2) Denbury's Integrity Management Program ("IMP") did not appear to address

19          integrity threat identification and/or assessment for geohazards or preventatives or

20          mitigative measures;

21          (3) Denbury's aerial patrols did not identify a geohazard at the failure location prior

22          to the accident;

23          (4) Denbury's CO2 dispersion model underestimated the potential affected area that

24          could be impacted by a release.  As a result, the pipeline segment was not identified

25          as a "could affect" HCA and Satartia was not included in Denbury's Public

26          Awareness Program ("PAP"); and

1    (5) Denbury did not notify local responders advising them of a potential failure.

2    The first three contributing factors all related to geohazards, which Denbury failed to

3    identify and in turn, failed to incorporate into their O&M procedures and IMP.  To avoid a

4    similar situation, Summit has undertaken extensive geohazard investigations.   While

5    Summit witness Erik Schovanec can provide more detailed information, Summit has

6    conducted a geohazard analysis across the entire route of the pipeline and implemented all

7    mitigative measures identified by that analysis.  Summit has also complied with PHMSA's

8    Advisory Bulletin issued on June 2, 2022 "Pipeline Safety: Potential for Damage to

9    Pipeline Facilities Caused by Earth Movement and Other Geological Hazards" that was

10   published following the Satartia incident.  These activities are intended to identify and

11   mitigate geohazard risks and take account of them in Summit's O&M procedures and IMP.

12   In addition, while federal regulations require that the IMP apply to HCA areas, Summit has

13   committed to applying the IMP to every segment of its pipeline.

14       The fourth contributing factor found by PHMSA in the Satartia incident was that

15   Denbury's CO2 dispersion model underestimated the potential affected area that could be

16   impacted by a release.  As a result, the pipeline segment was not identified as a "could

17   affect" HCA and in turn, the village of Satartia was not included in Denbury's Public

18   Awareness Program ("PAP").  Unlike Denbury, Summit has undertaken a more robust

19   dispersion analysis, including additional steps to identify areas CO2 could potentially reach

20   in the unlikely event of an incident.  Summit Witness Bryan Louque can speak to the

21   process in more detail, but in general terms, Summit had Audubon Field Services

22   ("Audubon") go a step further than a traditional analysis; Audubon modeled overland

23   spread of CO2 in critical valleys that could assist in the transport of a CO2 release to HCAs

1     and OPAs in order to identify any such additional areas.  Based on those results, Summit

2     will incorporate all could affect HCAs identified in its Public Awareness Program,

3     avoiding a similar result to Denbury.

4            The fifth contributing factor was Denbury's failure to notify local responders

5     advising them of a potential failure.  Because Denbury's dispersion analysis did not

6     identify the village of Satartia as a could affect HCA, it was not included in Denbury's

7     public awareness program or its  emergency response plan (ERP).  Summit witness Rod

8     Dillon can speak in more detail about Summit's public awareness and emergency response

9     plans, but in general, due to the robust nature of the dispersion analysis performed by

10    Audubon, all communities which could be affected in the unlikely event of a release will

11    be included in Summit's PAP and local emergency response plans, so that first responders

12    are alerted at the earliest possible moment of a pipeline failure.

13  **Q.**   **CERTAIN OBJECTORS HAVE SUGGESTED THAT THE NORTH DAKOTA**
14       **PSC'S ORDER OF AUGUST 4, 2023 DENYING SUMMIT'S PERMIT**
15       **APPLICATION PROVIDES A REASON FOR THE IOWA UTILITIES BOARD**
16       **TO DENY SUMMIT'S PERMIT APPLICATION.  HOW DO YOU RESPOND?**
17

18  **A.**   First, I note that Summit's Petition to the Board and Summit's Application to the

19    North Dakota PSC are separate applications to separate regulatory bodies covering separate

20    geographic and jurisdictional boundaries.   Those distinct regulatory bodies also have

21    different rules, regulations, and considerations that determine whether to grant a permit.  In

22    addition, there are other governmental and regulatory agencies that must consider whether

23    to grant various permits within their respective jurisdictions.   The Board's consideration

24    of the Petition before it is not impacted by those other agencies' processes, which proceed

25    under different regulations, and on different timelines from the Board's.

1    Second, while the North Dakota PSC denied Summit's initial application, Summit

2    has since submitted a Petition for Reconsideration that includes a revised route, and

3    Summit has every reason to believe the North Dakota PSC will grant a permit based on the

4    Petition for Reconsideration.   The minor deficiencies in the record noted in the PSC' Order

5    were remedied, and Summit has reason to believe that the denial was based primarily on

6    the location of the pipeline with respect to the City of Bismarck.   Summit's Petition for

7    Reconsideration incorporates a revised route which it believes addresses those concerns.

8    The reconsideration process is expedited and Summit believes its permit application could

9    be approved by yearend.   I also note that recent public comments by public officials

10   demonstrate confidence in the project in North Dakota, including comment by Governor

11   Doug Burgum, who mentioned the reconsideration process and stated: "I have every

12   expectation that pipeline is going to get approved in North Dakota."[1]

13   **Q.    CERTAIN INTERVENORS HAVE MENTIONED THE USE OF CO2 FOR**
14   **ENHANCED OIL RECOVERY ("EOR"). DOES SUMMIT INTEND TO SHIP C02**
15   **FOR USE IN EOR?**
16
17   A.    No.  Summit does not intend to ship CO2 for use in EOR.  At present, all parties intending

18        to ship on Summit's pipeline system intend to permanently sequester the CO2 being

19        shipped.

20   **Q.    DOES THIS CONCLUDE YOUR TESTIMONY?**
21
22   A.    Yes.

---

[1] See Burgum confident Summit carbon pipeline will be built - Radio Iowa; GOP candidate Doug Burgum touts
energy prowess at Iowa State Fair (desmoinesregister.com).



U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

9/15/2023

Mr. Lee Blank
CEO
Summit Carbon Solutions
2321 N Loop Dr. Suite 221
Ames, Iowa 50010

Dear Mr. Blank:

The Pipeline and Hazardous Materials Safety Administration (PHMSA) has received several
inquiries regarding the ability of federal, state, and local governments to affect the siting, design,
construction, operation, and maintenance of carbon dioxide pipelines. The widespread interest in
understanding PHMSA's authorities underscores a need to reiterate the message we shared in
2014 with a company proposing a high-visibility interstate pipeline, a message directly related to
current pipeline projects proposed by your companies.

As was the case in 2014, PHMSA continues to support and encourage all three levels of
government—federal, state, and local—working collaboratively to ensure the nation's pipeline
systems are constructed and operated in a manner that protects public safety and the
environment.

Congress has vested PHMSA with authority to regulate the design, construction, operation, and
maintenance of pipeline systems, including carbon dioxide pipelines, and to protect life,
property, and the environment from hazards associated with pipeline operations. While the
Federal Energy Regulatory Commission has exclusive authority to regulate the siting of
interstate gas transmission pipelines, there is no equivalent federal agency that determines siting
of all other pipelines, such as carbon dioxide pipelines. Therefore, the responsibility for siting
new carbon dioxide pipelines rests largely with the individual states and counties through which
the pipelines will operate and is governed by state and local law.

**The Role of PHMSA**

Under the federal pipeline safety laws (49 U.S.C. § 60101 *et seq.*), PHMSA is charged with
carrying out a nationwide program for regulating the country's pipelines that transport gas,
hazardous liquids, and carbon dioxide. With passage of the federal pipeline safety laws,
Congress determined pipeline safety is best promoted through PHMSA's development of
nationwide safety standards.

**SUPP APP 16**

PHMSA takes this responsibility seriously and has promulgated comprehensive safety regulations at 49 C.F.R. Parts 190-199. Dozens of current federal requirements regulate the safety of carbon dioxide pipelines' design,[1] construction,[2] testing,[3] operation and maintenance,[4] operator qualification,[5] corrosion control,[6] and emergency response planning.[7] PHMSA inspects compliance with these requirements and enforces these standards through administrative and judicial enforcement processes.

Recently, PHMSA promulgated new, more stringent standards for automatic and remote shut off valves that affect carbon dioxide pipelines (Additional information: "New rule will help improve public safety and reduce greenhouse gas emissions following pipeline failures").[8] PHMSA also announced a number of additional actions to strengthen current pipeline safety requirements for carbon dioxide pipelines (Additional information: "PHMSA announces new safety measures to protect Americans from carbon dioxide pipeline failures"),[9] including a new rulemaking which is currently under way.

While rulemakings like this involve meticulous crafting of highly technical updates, PHMSA also retains broad authority to address imminent risks to the public posed by a pipeline —even if not specifically delineated in a rule or standard. To this extent, PHMSA will engage with all carbon dioxide pipeline project developers to ensure any unique and imminent risks from such projects are adequately mitigated pursuant to PHMSA's statutory safety authority.

**The Role of State Pipeline Regulators**

Federal safety standards apply to both interstate and intrastate pipeline facilities. Only PHMSA can regulate the safety of interstate pipelines, and federal pipeline safety laws expressly prohibit states from enacting or enforcing pipeline safety standards with respect to interstate pipelines (except one-call notification program regulations). However, through an agreement with PHMSA, a state authority may be authorized to inspect interstate pipelines as an agent of PHMSA, and to refer violations to PHMSA for enforcement. Thus, PHMSA's state partners play an important role in assisting to oversee the safety of the nation's interstate pipelines.

PHMSA's state partners also play a critical role in regulating the safety of intrastate pipelines. A state authority that submits a certification to PHMSA may assume exclusive regulatory authority for the safety of its intrastate pipelines. The certification must document, among other things,

---

[1] 49 CFR part 195, subpart C (https://www.ecfr.gov/current/title-49/subtitle-B/chapter-I/subchapter-D/part-195/subpart-C).

[2] Subpart D (https://www.ecfr.gov/current/title-49/subtitle-B/chapter-I/subchapter-D/part-195/subpart-D).

[3] Subpart E (https://www.ecfr.gov/current/title-49/subtitle-B/chapter-I/subchapter-D/part-195/subpart-E).

[4] Subpart F (https://www.ecfr.gov/current/title-49/subtitle-B/chapter-I/subchapter-D/part-195/subpart-F).

[5] Subpart G (https://www.ecfr.gov/current/title-49/subtitle-B/chapter-I/subchapter-D/part-195/subpart-G).

[6] Subpart H (https://www.ecfr.gov/current/title-49/subtitle-B/chapter-I/subchapter-D/part-195/subpart-H).

[7] E.g., Subpart F, §§ 195.402, 195.403, 195.408.

[8] https://www.phmsa.dot.gov/news/phmsa-announces-requirements-pipeline-shut-valves-strengthen-safety-improve-response-efforts

[9] https://www.phmsa.dot.gov/news/phmsa-announces-new-safety-measures-protect-americans-carbon-dioxide-pipeline-failures

that the state has appropriate jurisdiction under state law; has adopted the federal safety standards to which the certification applies; inspects operators for compliance with those standards; and enforces the standards to address noncompliance.

PHMSA's national regulatory program relies heavily on the efforts of these state partners, who employ roughly 70 percent of all pipeline inspectors and whose jurisdiction covers more than 80 percent of regulated pipelines. As noted above, federal law requires certified state authorities to adopt safety standards at least as stringent as, and compatible with, the federal standards. The state authorities will also inspect, regulate, and take enforcement action against operators of intrastate pipelines within their borders.

**The Role of Local Governments**

Federal preemption of pipeline safety means that states do not have independent authority to regulate pipeline safety but derive that authority from federal law through a certification to PHMSA.

In the case of local governments that are not subject to federal certification of pipeline safety authority, they may still exercise other powers granted to them under state law but none that adopt or enforce pipeline safety standards or contradict federal law.

However, PHMSA cannot prescribe the location or routing of a pipeline and cannot prohibit the construction of non-pipeline buildings in proximity to a pipeline. Local governments have traditionally exercised broad powers to regulate land use, including setback distances and property development that includes development in the vicinity of pipelines. Nothing in the federal pipeline safety law impinges on these traditional prerogatives of local—or state—government, so long as officials do not attempt to regulate the field of pipeline safety preempted by federal law.

PHMSA recognizes local governments have implemented authorities under state law that contribute in many ways to the safety of their citizens. We have seen localities consider measures, such as:

1. Controlling dangerous excavation activity near pipelines.

2. Limiting certain land use activities along pipeline rights-of-way.

3. Restricting land use and development along pipeline rights-of-way through zoning, setbacks, and similar measures.

4. Requiring the consideration of pipeline facilities in proposed local development plans.

5. Designing local emergency response plans and training with regulators and operators.

6. Requiring specific building code design or construction standards near pipelines.

7. Improving emergency response and evacuation plans in the event of a pipeline release.

8. Participating in federal environmental studies conducted under the National Environmental Policy Act (NEPA) and similar state laws for new pipeline construction projects.

Each state treats these issues differently, so pipeline operators should be prepared to deal directly with each locality and state body interested in the siting and construction process.

**Collaboration Among Stakeholders**

PHMSA believes pipeline safety is the shared responsibility of federal and state regulators as well as all other stakeholders, including pipeline operators, excavators, property owners, and local governments. In 2010, PHMSA launched the Pipelines and Informed Planning Alliance (PIPA)—available at https://primis.phmsa.dot.gov/comm/pipa/LandUsePlanning.html—to help pipeline safety stakeholders define their respective roles related to land use practices near pipelines and to develop best practices.

The PIPA documents are 13 years old, but they remain of value today. PHMSA looks forward to you, along with other private and public stakeholders, engaging with PHMSA in updating these documents to focus on the unique circumstances of new pipeline construction. I encourage all pipeline operators to carefully consider and adopt, as appropriate, these best practices to protect their existing and proposed rights-of-way, and to engage all stakeholders in promoting the safety of interstate pipelines.

Each community affected by an existing or proposed pipeline faces unique risks.  The effective control and mitigation of such risks involves a combination of measures employed by facility operators, regulatory bodies, community groups, and individual members of the community. As a pipeline release can impact individuals, businesses, property owners, and the environment, it is important that all stakeholders carefully consider land use and development plans to make risk-informed choices that protect the best interests of the public and the individual parties involved. Sharing appropriate information with state or local governments and emergency planners, which may include dispersion models or emergency response plans, may help stakeholders make risk-informed decisions.

Bringing a pipeline into a community is often a complicated endeavor that requires tremendous coordination and open communication among stakeholders to be successful. We greatly value the efforts of pipeline operators who spend the time and energy to make sure the process goes smoothly and are responsive to all parties involved. Thank you for your cooperation in this effort.

Sincerely,


Alan K. Mayberry
Associate Administrator for Pipeline Safety

# Draft Emergency Response Plan

**Project Name:**
Summit Carbon Solutions Midwest Carbon Express

**Iowa Utilities Board Docket Number:**
HLP-2021-001

**SCS Document Number:**
SCS-0500-SM-01-PLN-002

**Date**
August 16, 2023

## REVISION HISTORY

| DATE | REVISION | REVISION DESCRIPTION | PREPARED BY: | REVIEWED BY: | APPROVED BY: |
|------|----------|---------------------|--------------|--------------|--------------|
| 2023-08-16 | 0 | Draft Plan | RD | JS | RD |



## ACRONYMS

| Acronym | Description |
|---------|-------------|
| ACGIH | American Conference of Governmental Industrial Hygienists |
| AOC | Abnormal Operating Conditions |
| CFR | Code of Federal Regulations |
| CST | Company Support Team |
| $CO_2$ | Carbon Dioxide |
| FOSC | Federal On-Scene Coordinator |
| IAP | Incident Action Plan |
| IC | Incident Commander |
| ICP | Incident Command Post |
| ICS | Incident Command System |
| IDLH | Immediately Dangerous to Life and Health |
| LOSC | Local On-Scene Coordinator |
| LRT | Local Response Team |
| MCE | Midwest Carbon Express |
| NIOSH | National Institute of Occupational Safety and Health |
| NRC | National Response Center |
| $O_2$ | Oxygen |
| OQ | Operator Qualification |
| OSHA | Occupational Safety and Health Administration |
| PEL | Permissible Exposure Limit |
| PHMSA | Pipeline and Hazardous Materials Administration |
| PSAP | Public Safety Answering Point |
| psi | pounds per square inch |
| QI | Qualified Individual |
| SCS | Summit Carbon Solutions |
| SOSC | State On-Scene Coordinator |
| SPA | Single point accountability |
| UC | Unified Command |

## GLOSSARY OF TERMS

| Term | Description |
|------|-------------|
| Agency Personnel | Agency personnel refers to local, county, state, and/or federal employees, contractors, or businesses employed by governmental entities. |
| Blowdown | The act of releasing gas from the pipeline system so work can be done safely on the depressurized facilities. |
| Controlled Release | Often occurs due to safety reasons surrounding facility design, or intentional venting to perform maintenance or inspection of equipment. |
| Immediately Dangerous to Life and Health (IDLH) | The National Institute of Occupational Safety and Health (NIOSH) defines an IDLH condition as a situation "that poses a threat of exposure to airborne contaminants when that exposure is likely to cause death or immediate or delayed permanent adverse health effects or prevent escape from such an environment". The IDLH limit represents the concentration of a chemical in the air to which healthy adult workers could be exposed (if their respirators fail) without suffering permanent or escape-impairing health effects. |
| Unintentional Release | A release caused by equipment leaks, defective seals, damaged pipeline, or other abnormal operating conditions. |

## TABLE OF CONTENTS

1    PURPOSE................................................................................................................................... 1

2    SCOPE OF THE PLAN ............................................................................................................... 1

3    RESPONSE TEAMS ................................................................................................................... 3

4    PROCEDURE .............................................................................................................................. 10

    4.1    RECEIVING, IDENTIFYING, AND CLASSIFYING INCIDENTS.................................................... 10
    4.2    PROMPT AND EFFECTIVE RESPONSE ................................................................................. 13
    4.3    PERSONNEL AND EQUIPMENT ........................................................................................... 16
    4.4    RELEASE OF CARBON DIOXIDE ......................................................................................... 16
    4.5    PRE-PLANNING EMERGENCY RESPONSE ACTIVITIES WITH PUBLIC SAFETY ANSWERING POINT, FIRE, POLICE, AND OTHER PUBLIC OFFICIALS.................................................................................................................................. 17
    4.6    REQUIRED PIPELINE CONTROLLERS ACTIONS..................................................................... 17

5    SCS INTERNAL CONTACTS..................................................................................................... 17

6    PUBLIC SAFETY ANSWERING POINTS AND RAILROAD CONTACT INFORMATION.............. 18

7    FEDERAL AND STATE AGENCY NOTIFICATIONS ................................................................. 19

    7.1    FEDERAL AGENCIES .......................................................................................................... 19
    7.2    STATE AGENCIES .............................................................................................................. 21

8    CONTRACTOR CONTACT INFORMATION ............................................................................... 22

9    TRAINING & EXERCISES.......................................................................................................... 22

    9.1    TRAINING.......................................................................................................................... 22
    9.2    EXERCISES......................................................................................................................... 22

10    OPERATOR QUALIFICATION TASKS...................................................................................... 23

11    RECORDS/FORMS.................................................................................................................... 23

12    REFERENCES OR RELATED DOCUMENTS............................................................................ 31

13    PLAN MAINTENANCE.............................................................................................................. 31

DISCLAIMER.................................................................................................................................... 33

## LIST OF FIGURES

Figure 2.1 General Pipeline System ........................................................................................................2

Figure 3.1 Incident Commend System Organization ..............................................................................5

Figure 4.1: Emergency Notification Flowchart .....................................................................................12

Figure 12.1: ICS 201 Incident Briefing..................................................................................................24

Figure 12.2: ICS 214a Individual Log ....................................................................................................28

Figure 12.3: Incident Notification Form................................................................................................29

Figure 12.4: Initial Notification Form....................................................................................................30

# 1    Purpose

This Emergency Response Plan (ERP or Plan) is for the Midwest Carbon Express (MCE) pipeline system operated by Summit Carbon Solutions, LLC (SCS or Company) located in Iowa.  The purpose of the ERP is to provide guidance for quick, safe, and effective response to an emergency to protect the public, all responders, SCS personnel, and the environment.

# 2    Scope of the Plan

This plan been developed to meet the requirements of 49 Code of Federal Regulations (CFR) 195.402(e) and is intended to cover incidents that could occur along the pipeline system.

This Plan is intended to provide the necessary information for pre-emergency planning as well as procedures for Company personnel to respond to and mitigate incidents during an emergency .  A description of the pipeline system operations is included in Figure 2.1.  Response procedures and guidelines are provided in Section 4 of this plan.

**Figure 2.1 General Pipeline System**

| General Pipeline System Information | |
|---|---|
| **Pipeline Name:** | Midwest Carbon Express |
| **Operator Name:** | Summit Carbon Solutions, LLC |
| **Operator Address:** | 2321 North Loop Drive<br>Suite 221<br>Ames, IA 50010 |
| **Mainline Number** | 24-hour Emergency: [TBD before system startup]<br>Corporate Headquarters: 515-531-2635 |
| **Qualified Individual(s):** | Director, Regulatory Compliance (see Section 5 for contact information) |
| **States Traversed:** | Minnesota, North Dakota, South Dakota, Nebraska, Iowa |
| **Pipeline Description** | |

The Summit Carbon Solutions Midwest Carbon Express pipeline will consist of approximately 2,000 miles of a high-strength carbon steel comprised of 4- to 24-inch diameter pipe. The pipeline will be operated with a maximum operating pressure of 2,183 pounds per square inch (psi) and the CO2 will be maintained in a dense phase or supercritical state during normal operations.

**Product Description**

$CO_2$ is naturally occurring in the atmosphere, used in the food and beverage industry, and produced by the human body during ordinary respiration, so it is commonly perceived by the general public to be a relatively harmless gas. However, at concentrations of 4% by volume (40,000 parts per million [ppm]), $CO_2$ is Immediately Dangerous to Life or Health (IDLH), and at concentrations of 8% by volume (80,000 ppm) can cause dimmed sight, sweating, tremor, unconsciousness, and possible death by asphyxiation.[1] Because $CO_2$ is colorless, odorless, and heavier than air, a significant uncontrolled release may cause $CO_2$ to temporarily accumulate near the ground in low lying outdoor areas, and in confined spaces such as caverns, tunnels, and basements until it dissipates into the atmosphere. $CO_2$ is not flammable, combustible, or explosive.

---

[1] https://www.fsis.usda.gov/sites/default/files/media_file/2020-08/Carbon-Dioxide.pdf

# 3    Response Teams

## Introduction

This section describes organization features and duties of the Company's Qualified Individual (QI), Local Response Team (LRT), and Company Support Team (CST). The Company's initial response to an incident will be provided by the LRT, once activated by the QI. The Incident Commander will activate a Company Support Team if an incident exceeds the local capabilities. In some cases, the initial responders to an incident may include local law enforcement and/or local fire department(s). SRC will work with these agencies to manage a coordinated response effort.

The National Incident Management System (NIMS) Incident Command System (ICS) will be used to manage emergency response activities. Because ICS is a management tool that is readily adaptable to incidents of varying magnitude, it will be used for all emergency incidents. Staffing levels will be adjusted to meet specific response team needs based on incident size, severity, and type of emergency. Local agencies are also trained on using ICS and may fill roles during a coordinated response effort. ICS principles include:

- Common Terminology
- Manageable Span of Control
- Management by Objectives
- Incident Action Planning
- Comprehensive Resource Management
- Established Incident Facilities
- Integrated Communications

As a component of an ICS, the Unified Command (UC) is a structure that brings together the responsible party (i.e., SCS) and agencies at the command level. The UC links the organizations responding to the incident and provides a forum for the responsible party and responding agencies to make consensus decisions. Under the UC, the various responding agencies and company personnel may blend together throughout the organization to create an integrated response team. The ICS process requires the UC to set clear objectives to guide the on-scene response resources. The primary entities of a UC may be two or more of the following:

- Federal On-Scene Coordinator
- State On-Scene Coordinator
- Local On-Scene Coordinator
- Company Incident Commander (Responsible Party IC)

## Qualified Individual

The Qualified Individual (QI) is defined by PHMSA as a company employee that has been given authority to fund response efforts without consulting Company leadership for further authorization and knows how to commence the response procedures of this Plan. The QI is responsible for activating the ICS response organization, including the LRT and CST.

The QI will be an English-speaking SCS employee that is available on a 24-hour basis with the full authority to activate and deploy the necessary emergency response contractors. The QI or Alternate QI will activate personnel and equipment, act as a liaison with the UC, and obligate any funds required to carry out all the required or direct emergency response activities.

### Local Response Team

The first Company person on scene will function as the Incident Commander (IC) and person-in-charge until relieved by an authorized person who will then assume the position of IC. The number of positions/personnel required to staff the LRT will depend on the size and complexity of the incident. The duties of each position may be performed by the IC directly or delegated as the situation demands. The IC is always responsible for directing response activities and will assume the duties of all the primary positions until the duties can be delegated to other qualified personnel.

A typical ICS organization is shown in Figure 3.1. The LRT will fill the necessary positions and request additional support from the Company Support Team to fill/back up any additional positions necessitated by the incident. Detailed job descriptions of the response team positions are provided in this Section.

### Company Support Team

For response operations outside of the capabilities of the LRT, the QI and IC will determine the need for mobilization of a CST. The members of the LRT will typically become members of the CST.

The CST, once fully staffed, is designed to cover all aspects of a comprehensive and prolonged incident response. The number of positions/personnel required to staff the CST will depend on the size and complexity of the incident. During a prolonged response, additional personnel may be cascaded in to fill additional ICS positions or relieve responding personnel.

The CST is staffed by trained personnel from various Company locations and by various contract resources as the situation requires.

Case 1:22-cv-00020-SMR-SBJ    Document 78-1    Filed 10/12/23    Page 30 of 67
Filed with the Iowa Utilities Board on August 21, 2023, HLP-2024-0001

Summit Dillon Rebuttal Exhibit 2
Page 11 of 39

Figure 3.1 Incident Commend System Organization



## Incident Commend System Roles and Responsibilities

| Incident Commander |
|---|
| *The IC has responsibility for overall management of the incident. The IC has the authority to approve the use of a contractor even if no "open-end" contract exists, as well as the authority to commit monies to initiate response and clean-up activities. The first employee on-site will assume the responsibilities of IC until properly relieved. Generally, the most senior employee on-site will assume the IC position. The IC also has overall responsibility for the health and safety of responders.* |

| • | Assess the situation and/or obtain a briefing from the prior IC. |
|---|---|
| • | Determine incident objectives and strategy. |
| • | Establish the immediate priorities. |
| • | Establish an Incident Command Post (ICP). |
| • | Brief Command Staff and Section Chiefs. |
| • | Establish an appropriate response organization commensurate with the severity of the incident and potential for impact to public health and/or the environment |
| • | Ensure planning meetings are scheduled as required. |
| • | Approve and authorize the implementation of an Incident Action Plan (IAP). |
| • | Ensure that adequate safety measures are in place. |
| • | Coordinate activity for all Command and General Staff. |
| • | Coordinate with key people and officials |
| • | Approve requests for additional resources or for the release of resources. |
| • | Keep appropriate agencies/organizations informed of incident status. |
| • | Approve the use of trainees, volunteers, and auxiliary personnel. |
| • | Authorize release of information to the news media |
| • | Ensure Incident Status Summary (ICS Form 209) is completed and forwarded to appropriate higher authority |
| • | Order the demobilization of the incident response when appropriate. |

| Safety Officer |
|---|
| *The Safety Officer's (SOFR) function is to develop and recommend measures for assuring personnel safety, and to assess and/or anticipate hazardous and unsafe situations. Only one SO will be assigned for each incident; however, there may be assistants.* |

| • | Participate in planning meetings. |
|---|---|
| • | Identify hazardous situations associated with the incident. |
| • | Review the IAP for safety implications. |
| • | Exercise emergency authority to stop and prevent unsafe acts. |
| • | Investigate accidents that have occurred within the incident area. |
| • | Review and approve the medical plan. |
| • | Develop the Site Safety Plan and publish Site Safety Plan summary (ICS Form 208) as required. |

| **Public Information Officer** |
| --- |

*The Public Information Officer (PIO) is responsible for developing and releasing information about the incident to the news media, incident personnel, and other appropriate agencies and organizations.*

*Only one PIO will be assigned for each incident. The PIO may have assistants as necessary. The assistants may represent assisting agencies, companies, or jurisdictions. The PIO and assistants will establish a Joint Information Center to assist with developing information releases.*

| • | Determine from the IC if there are any limits on information release. |
| --- | --- |
| • | Develop material for use in media briefings. |
| • | Obtain IC approval of media releases. |
| • | Inform media and conduct media briefings. |
| • | Arrange for tours and other interviews or briefings that may be required. |
| • | Obtain media information that may be useful to incident planning. |
| • | Maintain current information summaries and/or displays on the incident and provide information on the status of the incident to assigned personnel. |

| **Liaison Officer** |
| --- |

*The Liaison Officer (LOFR) serves as a "go-between" linking the IC to various agencies. These are agencies that do not have a direct tactical assignment within the Unified Command but have an interest in the response activities or wish to offer assistance.*

*The Liaison Officer intercepts, greets, and briefs agency representatives as they arrive on scene. It is the responsibility of the Liaison Officer to notify the IC before escorting anyone to the Command Post. A separate Liaison Area may need to be established to accommodate agency representatives not directly involved in the Unified Command.*

| • | Be a contact point for Agency Representatives. |
| --- | --- |
| • | Maintain a list of assisting and cooperating agencies and Agency Representatives. Monitor check-in sheets daily to ensure that all Agency Representatives are identified. |
| • | Assist in establishing and coordinating interagency contacts. |
| • | Keep federal, state, local agencies supporting the incident aware of incident status. |
| • | Monitor incident operations to identify current or potential inter-organizational problems. |
| • | Participate in planning meetings, providing current resource status, including limitations and capability of assisting agency resources. |
| • | Coordinate response resource needs for incident investigation activities with the OPS. |
| • | Ensure that all required agency forms, reports, and documents are completed prior to demobilization. |
| • | Coordinate activities of visiting agencies or government officials arriving to survey the response. |

Filed with the Iowa Utilities Board on August 21, 2023, HLP-2024-0003

| Operations Section Chief (OPS) |
|---|
| *The Operations Section Chief (OPS) is responsible for the management of all operations directly applicable to the primary mission (i.e., clean-up, recovery etc.). The OPS activates and supervises tactical response elements in accordance with the Incident Action Plan (IAP) and directs its execution. The OPS also requests or releases resources; makes expedient changes to the IAP(as necessary); and reports these actions to the IC.* |

| | |
|---|---|
| • | Develop operations portion of IAP. |
| • | Brief and assign Operations Section personnel in accordance with the IAP. |
| • | Supervise Operations Section. |
| • | Determine need and request additional resources. |
| • | Review suggested list of resources to be released and initiate recommendation for release of resources. |
| • | Assemble and disassemble Strike Teams assigned to the Operations Section. |
| • | Report information about special activities, events, and occurrences to the IC. |

| Planning Section Chief |
|---|
| *The Planning Section Chief (PSC) is responsible for the collection, evaluation, dissemination and use of information; particularly with regard to the development of the incident and the status resources. This information is needed to: 1) understand the current situation, 2) predict the probable course of incident events; and 3) prepare alternative strategies for the incident.* |

| | |
|---|---|
| • | Collect and process situation information about the incident. |
| • | Supervise preparation of the IAP. |
| • | Provide input to the IC and the OPS in preparing the IAP. |
| • | Chair planning meetings and participate in other meetings as required. |
| • | Assign available personnel already on-site to ICS organizational positions as appropriate. |
| • | Establish information requirements and reporting schedules for Planning Section Units (e.g., Resources, Situation Units). |
| • | Determine the need for any specialized resources in support of the incident. |
| • | If requested, assemble and disassemble Strike Teams and Task Forces not assigned to Operations. |
| • | Establish special information collection activities as necessary (e.g., weather, environmental, toxics). |
| • | Assemble information on alternative strategies to meet response objectives. |
| • | Provide periodic predictions on incident potential. The incident potential examines the current situation and the potential future situation based on the incident specifics (e.g., adverse weather, potential community impacts, duration of incident response operations, legal concerns, etc.) |
| • | Report any significant changes in incident status or any Critical Reporting Requirements (CIR) to the Incident Commander. (e.g., injury, public health impacts, special request from agencies, etc.). |

| • | Compile and display incident status information. |
| • | Oversee preparation and implementation of the Incident Demobilization Plan. |
| • | Based on incident severity and site-specific conditions, incorporate ICS forms and plans (e.g., Traffic, Medical ICS 206, Communications ICS 205, Site Safety ICS 208) into the IAP. |

| Logistics Section Chief |
|---|

*The Logistics Section Chief (LSC) is responsible for providing facilities, services, and material in support of the incident. The LSC participates in the development and implementation of the IAP.*

*Resources are divided into Support and Services. Support resources are used in support of the IAP (i.e., boom, vacuum trucks, skimmers etc.). Service resources include food/water, communication, and medical resources.*

| • | Plan the organization of the Logistics Section. |
| • | Assign work locations and preliminary work tasks to Section personnel. |
| • | Notify the Resources Unit of the Logistics Section units activated including names and locations of assigned personnel. |
| • | Assemble and brief Branch Directors and Unit Leaders. |
| • | Participate in preparation of the IAP. |
| • | Identify service and support requirements for planned and expected operations |
| • | Provide input to and review the Communications Plan, Medical Plan and Traffic Plan. |
| • | Coordinate and process requests for additional resources. |
| • | Review the IAP and estimate Section needs for the next operational period. |
| • | Advise on current service and support capabilities. |
| • | Prepare service and support elements of the IAP. |
| • | Estimate future service and support requirements. |
| • | Recommend release of Unit resources in conformity with Incident Demobilization Plan. |
| • | Ensure the general welfare and safety of Logistics Section personnel. |

| Finance Section Chief |
|---|

*The Finance Section Chief (FSC) is responsible for all financial, administrative, and cost analysis aspects of the incident and for supervising members of the Finance Section. Depending on the incident, the FSC position may or may not be assigned. Agencies within the Unified Command may require and staff the FSC position.*

| • | Attend planning meetings as required. |
| • | Manage all financial aspects of an incident. |
| • | Provide financial and cost analysis information as requested. |
| • | Gather pertinent information from briefings with responsible agencies. |

Filed with the Iowa Utilities Board on August 21 2023, HLP-2021-0003

| • | Develop an operating plan for the Finance/Administration Section; fill supply and support needs. |
|---|---|
| • | Determine the need to set up and operate an incident commissary. |
| • | Meet with Assisting and Cooperating Agency Representatives, as needed. |
| • | Ensure that all personnel time records are accurately completed and transmitted, according to policy. |
| • | Provide financial input to demobilization planning. |
| • | Ensure that all obligation documents initiated at the incident are properly prepared and completed. |
| • | Brief administrative personnel on all incident-related financial issues needing attention or follow-up prior to leaving incident. |

## 4    Procedure

### 4.1    Receiving, Identifying, and Classifying Incidents

Generally, an incident is a chain of events which has caused, or could have caused, injury, illness, and/or damage to the environment or the public. In this Plan, an incident refers to an event requiring some form of action on behalf of the Company. Notification of incidents may occur via phone from external sources (the public or emergency response agencies such as fire or police), phone from employees or contractors, or operational monitoring by the Pipeline Control Center. Regardless of the source, each incident's relative risk will be continually evaluated and characterized until it has been controlled and resolved.  The initial Incident Commander role will be filled by the first Company employee to arrive at the incident scene.

An emergency is defined as an urgent, sudden, and serious event that requires immediate action that may result in harm to employees or the public, environmental degradation, and/or property damage.  If an emergency is reported, SCS will shut down the impacted system and make immediate notifications to ensure protection of the public and company personnel.

| Incident Classification | |
|---|---|
| Low Risk | Incidents that will not need to involve outside agencies, such as Police, Fire, etc. |
| | Incidents that can be secured by the Pipeline Operations field personnel that do not impact the public or environment. |
| | Examples may include: |
| | 1.    Incipient stage fires addressed with hand-held extinguishers |
| | 2.    Small spills of fuel, lube oil, or other regulated materials that remain in containment or small releases that disperse immediately into the atmosphere |
| | 3.    Minor injuries not requiring hospitalization |
| High Risk | Incidents that require an immediate response by the Pipeline Controller and Pipeline Operations Field personnel, such as: |
| | 1.    Accidental/uncontrolled release of $CO_2$ from the pipeline |
| | 2.    Fire beyond the capabilities of a handheld extinguisher or explosion occurring near or directly involving a pipeline facility |
| | 3.    Operational failure causing a hazardous condition |

**Summit Dillon Rebuttal Exhibit 2**
**Page 17 of 39**

## Communicating to Appropriate Operator Personnel

Should notification of an event relating to a pipeline leak or potential emergency which requires immediate response be received, the following Emergency Notification Flowchart, located in Figure 4.1, provides guidance regarding notification of appropriate operator personnel, contractors, emergency, and public officials.



**Figure 4.1: Emergency Notification Flowchart**



### 4.2    Prompt and Effective Response

A prompt and effective response to each type of incident identified in Section 4.1 is critical to minimizing any adverse effect to public health,  the environment, and property.

- All immediate response events (high risk) identified in Section 4.1 should be mitigated by shutting down the pipeline segment(s) involved as soon as possible.
- If the notification is taken by the Pipeline Controller, the pipeline segment(s) involved will be shut down immediately.
- Any other individual receiving notification will immediately notify the Pipeline Controller for immediate shutdown of the affected pipeline segment(s).
- The Control Center shall determine the external notification that need to be made based on the incident type and severity.  See Section 6 for PSAP for each county and Section 7 for regulatory notifications, both federal and state, including the public.

Initial response actions are those taken by local personnel immediately upon becoming aware of a discharge or emergency incident before the LRT Team (described in Section 3) is formed and functioning.

The first SCS employee on-scene will function as the IC until properly relieved.  The person functioning as the IC during the initial response period has the authority to take the steps necessary to control the situation and must not be constrained by these general guidelines.

### Initial Response Actions

| Initial Response Action Checklist | |
|---|---|
| ❑ | Take appropriate personal protective measures and utilize $CO_2$ monitoring equipment to ensure public and responder safety, as the situation demands. |
| ❑ | Confirm Control Center has been notified. |
| ❑ | Call for medical assistance if an injury has occurred. |
| ❑ | Restrict access to the incident site and adjacent areas as the situation demands.  Take additional steps necessary to minimize any threat to health and safety.  Contact local police or fire to assist as needed. |
| ❑ | Assess the magnitude of the incident and quantity released. |
| ❑ | Advise public/personnel in the area of any potential threat and/or initiate evacuation procedures. |
| ❑ | Use testing and sampling equipment to determine potential safety hazards, as the situation demands. |
| ❑ | Identify/Isolate the source and minimize the loss of product, as appropriate. |
| ❑ | Take necessary fire response actions and/or contact the local fire department to assist as needed |
| ❑ | Notify Management of the incident. |
| ❑ | Utilize the ICS 201 form to begin logging all field activities and decisions. |

## Incident Specific Response Actions

Should notification be received of high risk incident, the following procedures will be followed:

- Accidental/Uncontrolled release of $CO_2$ from the pipeline.
  - Confirmation will be made by personnel on-scene that Pipeline Control is aware of the incident to effectuate shut down of the pipeline and closure of mainline valves to isolate the release and minimize the amount of $CO_2$ released.
  - Consideration should be given to notifying and evacuating the public downwind of the release and closing roads. Coordinate with nearby fire departments and law enforcement to aid in any evacuation efforts.
  - Pipeline Control will call the appropriate public safety answering point (PSAP) and nearby fire departments, law enforcement, and other appropriate agencies. See Section 6 for a listing of PSAPs and Section 7 for agency contacts.  Personnel on-scene during an incident may call 911 directly.
  - Pipeline Control dispatches Company Response Crew to investigate the incident and notifies the Qualified Individual.
  - Company Response Crew arrives at the incident site and completes initial response actions.  A designated Company person from the response crew will fill the initial IC position.
  - The IC will conduct a risk assessment and coordinate with the Qualified Individual to determine what ICS positions need to be filled for the LRT.
  - The Qualified Individual or IC will establish liaison with the local emergency coordinating agencies, such as the 911 emergency call centers or county emergency managers in lieu of communicating individually with each fire, police, or other public entity.
  - If the response exceeds local capabilities, the IC will coordinate with the QI to determine the need for mobilization of a CST.
- Fire or explosion occurring near or directly involving a pipeline facility. Note, $CO_2$ is not flammable, combustible, or explosive.
  - Call for assistance from nearby fire departments and company personnel as needed. Take all possible actions to keep fire from spreading to pipeline equipment. If fire still threatens the pipeline, activate shutdown procedure and depressurize threatened pipeline segments as practical.
  - For an explosion involving a pipeline facility, shut down the pipeline.
  - The IC will conduct a preliminary assessment of the situation upon arrival at the scene. Evaluate scene for potential hazards.  Determine what product is involved.
  - Assemble the LRT at the Command Post.
  - Coordinate response efforts with on-scene fire department.
- Operational failure causing a hazardous condition.
  - Confirmation will be made by personnel on-scene that Pipeline Control is aware of the incident to effectuate shut down of the pipeline and closure of mainline valves to isolate the release and minimize a hazardous conditions.

- Consideration should be given to evacuating the public downwind of the release and closing roads. Coordinate with nearby fire departments and law enforcement to aid in any evacuation efforts.
- Pipeline Control will call the appropriate PSAP and nearby fire departments, law enforcement, and other appropriate agencies. See Section 6 for a listing of PSAPs and Section 7 for agency contacts. Personnel on-scene during an incident may call 911 directly.
- Pipeline Control dispatches LRT to investigate the incident and notifies the Qualified Individual.
- Company Response Crew arrives at the incident site and completes initial response actions. A designated Company person from the response crew will fill the initial IC position.
- The IC will conduct a risk assessment and coordinate with the Qualified Individual to determine what ICS positions need to be filled for the LRT.
- The Qualified Individual or IC will establish liaison with the local emergency coordinating agencies, such as the 911 emergency call centers or county emergency managers in lieu of communicating individually with each fire, police, or other public entity.
- If the response exceeds local capabilities, the IC will coordinate with the QI to determine the need for mobilization of a CST.

- Fire or explosion occurring near or directly involving a pipeline facility. Note, $CO_2$ is not flammable, combustible, or explosive.
  - Call for assistance from nearby fire departments and company personnel as needed. Take all possible actions to keep fire from spreading to pipeline equipment. If fire still threatens the pipeline, activate shutdown procedure, and depressurize threatened pipeline segments as practical.
  - For an explosion involving a pipeline facility, shut down the pipeline.
  - The IC will conduct a preliminary assessment of the situation upon arrival at the scene. Evaluate scene for potential hazards. Determine what product is involved.
  - Assemble the LRT at the Command Post.
  - Coordinate response efforts with on-scene fire department.

### 4.3    Personnel and Equipment

SCS will provide personnel, equipment, instruments, tools, and material as needed to respond to an emergency incident.

- All local company personnel are available for call-out as needed for duty on a 24-hour basis to support public safety agencies.
- Additional personnel, if required, will be acquired from agency responders from public safety agencies and/or response contractors.
- If public authorities are involved, they will be given full cooperation and assistance. In no event shall such cooperation and assistance violate safety rules or consist of actions that would endanger the public or employees.
- Company employees, contractors, and agency responders will be equipped with tools, supplies, and equipment available to be used in cases of emergency conditions existing on or near the pipeline system. $CO_2/O_2$ monitoring devices should be used in the event of an accidental/uncontrolled release of $CO_2$. Self-contained breathing apparatus may be required pending results from on site-specific hazards and monitoring results.

### 4.4    Release of Carbon Dioxide

In the event of a breach of pipeline integrity resulting in an uncontrolled release of $CO_2$, following actions will be coordinated to minimize hazards to public health, the environment, and property.

Pipeline Control will immediately identify any possible rupture and fully close any remote mitigation valves to minimize the volume of $CO_2$ released from the pipeline.

Pipeline Control will notify the PSAP and/or other agencies such as fire and law enforcement as well as aerial patrol to assist in identifying the location of the release. Aerial patrol will look for:

- blowing soil;
- presence of frost near the pipeline right of way;
- vapor cloud similar to that produced by dry ice; and
- dead or dying vegetation on or near the pipeline right of way in an otherwise green area.

Based upon the estimated volume of the release, topography, proximity of habitable structures, and weather conditions, work with the local emergency response agencies to effect orderly evacuation of the public. The safety of the public and the response team comes first.

Notify emergency agencies to help control traffic, establish danger zones to control sightseers, and determine if it is advisable to set up roadblocks. Roadblocks may be needed for pedestrian, automotive, and train traffic. If  active train tracks are near or crossing the  area of  potential impact, the railroad dispatcher will be notified (telephone numbers of railroad dispatchers are included in Section 6 of this procedure).

As appropriate, deploy outside assistance such as construction contractors or additional air monitoring services.

If roadblocks are set up, advise the controlled points of any resources which have been contacted so they may be admitted to the controlled area.

### 4.5 Pre-planning Emergency Response Activities with Public Safety Answering Point, Fire, Police, and Other Public Officials

To enhance cooperation during an incident response, SCS will liaise with agency responders and public officials including participating in emergency tabletop exercises, coordinating meetings to discuss hazards and emergency response, and conducting facility tours or open houses. These and other public outreach activities will be included in the Public Awareness Program that will be developed and implemented prior to commencing operation of the pipeline.

### 4.6 Required Pipeline Controllers Actions

Pipeline Control actions during emergency response actions will be detailed in the Control Room Management Plan to be developed and implemented prior to commencing pipeline operations. Generally, the actions will include:

- Identifying abnormal operating conditions – including potential pipeline ruptures;
- Confirmation of abnormal conditions;
- Specific steps to take in response to certain abnormal conditions – including closing valves, notifications internal to SCS, and external to agency responders; and
- Specific steps to take following pipeline shutdown to re-establish pipeline operations.

## 5 SCS Internal Contacts

| Internal Contacts | | | |
|---|---|---|---|
| Position/Title | Name | Office | Cell |
| **Qualified Individual** Director, Regulatory Compliance | | | |
| **Alternate (QI)** TBD | | | |
| TBD | | | |

## 6    Public Safety Answering Points and Railroad Contact Information

| Public Safety Answering Points (PSAPs) | |
|---|---|
| TBD | |
| TBD | |

| Railroad Emergency Contact – 24/7 | |
|---|---|
| TBD | |
| TBD | |
| | |

## 7    Federal and State Agency Notifications

### 7.1    Federal Agencies

**FEDERAL PIPELINE SAFETY REPORT NATIONAL RESPONSE CENTER**
c/o United States Coast Guard (CG-5335) – Stop 7581
Washington, DC  20593-0001

| 24 Hour Phone | (800) 424-8802 |
|---|---|

**REPORTING REQUIREMENTS**:  The NRC is the sole federal point of contact for reporting carbon dioxide, CO2, releases which enter or threaten to enter the navigable waters of the United States and for pipeline related incidents/ accidents as defined by the Department of Transportation / Office of Pipeline Safety. If you have a release or a pipeline incident/accident to report, contact the NRC at the earliest practicable moment **(within 1 hour)** via the toll-free number, or visit the NRC website (https://nrc.uscg.mil/l) for additional information on reporting requirements and procedures. For those without 800 access, please contact the NRC at 202-267-2675.

**Type:**
Any discharge that has impacted or threatens to impact navigable waters or a release that meets the criteria of PHMSA's reporting requirements under 49 CFR 195 (see PHMSA reporting requirements on the next page).

**Verbal Notification:**
Immediately (not later than one (1) hour of confirmation discovery to meet 49 CFR 195.52(a)).  See PHMSA notification for follow-up NRC notification criteria within 48 hours).

| | Telephonic Reporting Must Include the Following Information: |
|---|---|
| 1 | Name and address and operator identification number (OPID) of Summit |
| 2 | Name and telephone number of the reporter |
| 3 | The location of the failure |
| 4 | The time of the failure |
| 5 | The fatalities and personal injuries (if any) |
| 6 | All other significant facts known by Summit that are relevant to the cause of the failure or extent of the damages or extent of the damages. |

**PIPELINE AND HAZARDOUS MATERIALS ADMINISTRATION (PHMSA)**
US Department of Transportation
1200 New Jersey Avenue, SE. Washington, DC 20590
(800) 424-8802 – 24 hours to NRC/emergency number
202-373-2428

**REPORTING REQUIREMENTS**

**Type:**

In addition to the reporting of accidents to the NRC as noted below, a written accident report (PHMSA Forms 7000-1 via the online PHMSA Portal) must be submitted for releases resulting in any of the following:

– Explosion or fire not intentionally set by Summit.
– Release of five gallons or more of carbon dioxide, except that no report is required for a release of less than five barrels resulting from a pipeline maintenance activity if the release is:
– not one described under the NRC's reporting conditions
– confined to company property or pipeline right-of-way; and
– cleaned up promptly.
– Death of any person.
– Personal injury necessitating hospitalization.
– Estimated property damage, including cost of clean-up and recovery, value of lost product, and damage to the property of the operator or others, or both, exceeding $50,000
– Written reports are required to be submitted as soon as practicable but **no later than 30 days** after discovery of the accident on DOT Form 7000-1. Reports shall be filed by the Manager, EHS or designee. Changes or additions to the original report (PHMSA Form 7000-1) must be filed as a supplemental report within 30 days.

**Verbal Notification:**

Call to the NRC, within one (1) hour of confirmed discovery and within 48 hours revise or confirm initial report, meets the required verbal notification under PHMSA reporting requirements.

**Written Notification:**

As soon as practicable, an accident meeting any of the above criteria must be report via the PHMSA Portal at the following link:
https://portal.phmsa.dot.gov/portal

| OSHA |  |
|---|---|
| Occupational Safety and Health Administration |  |
| Occupational Safety & Health Administration (OSHA) Hotline | (800) 321-6742 |
| Basic requirement. ALL fatalities (regardless if they are work related or not) must be reported to OSHA within **8 hours** of occurrence.  **Work-related inpatient hospitalizations, amputations and losses of an eye** occurring within 24 hours of the incident must be reported to OSHA within 24 hours. | |

**7.2    State Agencies**

| TBD |  |
|---|---|
|  |  |
|  |  |

## 8    Contractor Contact Information

SCS to provide listing of contractors prior to operations.

| Contractor Resources | | |
|---|---|---|
| **Company** | **Capability** | **Telephone** |
| TBD | | |
| | | |
| | | |
| | | |
| | | |

## 9    Training & Exercises

### 9.1    Training

The Director, Regulatory Compliance shall ensure that all required Company personnel have received Incident Command training and that all Company personnel working within the ICS response organization understand their roles and responsibilities and the chain of command.

Company personnel shall receive specialized initial training for their roles and will also receive annual training as required by the Company's training program. To remain active, all Company response personnel must meet all training requirements to maintain current certifications and response readiness.

As part of the training program, the Company will meet with agency personnel to discuss response preplanning and preparedness.

### 9.2    Exercises

A tabletop exercise is a facilitated discussion about what the Company would do in response to an emergency incident. The exercise leads participants through a simulated scenario and prompts them to examine plans, policies, and procedures without disrupting the work environment. It allows for a facilitated discussion of roles, procedures, and responsibilities in the context of a simulated scenario.

The goals of the tabletop exercise include:

- Evaluate the ability to prepare and respond using current plans, policies, procedures, and resources.
- Identify and document improvements for plans, policies, procedures, etc.

The tabletop should be designed to help identify strengths and areas for improvement. Example tabletop objectives may include:

- Evaluate the facility's response organization and operation within the response management system.
- Evaluate internal notifications and alerts, procedures, and training needs.

- Evaluate internal and external communications, including notifications to agencies and the public.
- Evaluate designated staging areas and other emergency response support locations, including activation of Company personnel.
- Evaluate response plans and procedures.
- Evaluate responder and equipment readiness.

Agency personnel will be given an opportunity to attend and participate in these exercises to help facilitate response actions, team integration, and agency expectations.

## 10    Operator Qualification Tasks

To comply with the Operator Qualification program requirements in 49 CFR 195 subpart G, an Operator must have written description of the processes used to determine the qualification of persons performing operations and maintenance tasks.  These descriptions and the maintenance of these records will be developed prior to the system becoming operational.

## 11    Records/Forms

Employees involved in emergency response should keep logs documenting the times of contacts and actions taken during the emergency. These logs may be useful when conducting the post- accident review.

- PHMSA Form 7000-1 Accident Notification Report
- Incident/Accident Investigation
- SCS Safety Manual

**Figure 12.1: ICS 201 Incident Briefing**

| 1. Incident Name | 2. Prepared by: (name) | | INCIDENT BRIEFING |
|---|---|---|---|
| | Date: | Time: | ICS 201-CG |

3. Map/Sketch   (include sketch, showing the total area of operations, the incident site/area, overflight results, trajectories, impacted shorelines, or other graphics depicting situational and response status)

4. Current Situation:

INCIDENT BRIEFING                                    ICS 201-CG (pg 1 of 4) (Rev 4/04)

| 1. Incident Name | 2. Prepared by: (name) | | INCIDENT BRIEFING |
| | Date: | Time: | ICS 201-CG |
|---|---|---|---|
| 5. Initial Response Objectives, Current Actions, Planned Actions | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

INCIDENT BRIEFING                    ICS 201-CG (pg 2 of 4) (Rev 4/04)

| 1. Incident Name | 2. Prepared by: (name) | INCIDENT BRIEFING |
|---|---|---|
| | Date:            Time: | ICS 201-CG |

**6. Current Organization** (fill in additional appropriate organization)

```
                                    _____
                                    _____
                                    _____
                                    _____
                                    _____
            ──── Safety Officer     _____
            ──── Liaison Officer    _____
            ──── Public Information Officer _____
```

| Operations Section | Planning Section | Logistics Section | Finance Section |
|---|---|---|---|
| | | | |

INCIDENT BRIEFING                                    ICS 201-CG (pg 3 of 4) (Rev 4/04)

| 1. Incident Name | | 2. Prepared by: (name) | | | | INCIDENT BRIEFING ICS 201-CG |
|---|---|---|---|---|---|---|
| | | Date: | | Time: | | |
| 7. Resources Summary | | | | | | |
| Resource | Resource Identifier | Date Time Ordered | ETA | On-Scene (X) | NOTES: (Location/Assignment/Status) | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**INCIDENT BRIEFING**

ICS 201-CG (pg 4 of 4) (Rev 4/04)

**Figure 12.2: ICS 214a Individual Log**

| 1. Incident Name | | 2. Operational Period (Date / Time) | | INDIVIDUAL LOG ICS 214a-OS |
|---|---|---|---|---|
| | | From: | To: | |
| 3. Individual Name | | 4. ICS Section | 5. Assignment / Location | |

| 6. Activity Log | | Page | of |
|---|---|---|---|
| Time | Major Events | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| 7. Prepared by: | Date / Time |
|---|---|

| INDIVIDUAL LOG | June 2000 | ICS 214a-OS |
|---|---|---|

**Figure 12.3: Incident Notification Form**

| Incident Report Form | | | |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Name (First/Last): | | Day Phone: | |
| Title: | | Evening Phone: | |
| Operator Name: | | Organization Type: | |
| Facility Name: | | Company: | |
| Address: | | Address | |
| Facility Latitude: | , | Facility Longitude: | |

| Incident Details | | | | | | |
|---|---|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| Date/Time of Incident: | Date: | | | Time | | |
| Spill Location/Address: | | | | | | |
| Nearest City: | | State: | | County: | | Zip: |
| Section: | | Township | | Range: | | Borough |
| Distance from City | | | | Direction from City | | |
| Container Type: | | | | Container Storage Capacity | | |
| Facility Oil Storage Capacity (gallons): | | | | | | |

| Materials | | | |
|---|---|---|---|

| Discharge Amount | Unit of Measure | Impacted Water | Quantity Impacting Water |
|---|---|---|---|
| | | ☐ Yes  ☐ No | |
| | | ☐ Yes  ☐ No | |
| | | ☐ Yes  ☐ No | |

| Response Actions |
|---|

**Actions Taken to Correct, Control or Mitigate Incident:**

| Impact | | |
|---|---|---|

| | | |
|---|---|---|
| Number of Injuries | | Number of Deaths: |
| Evacuation Required: | ☐ Yes  ☐ No | Number Evacuated: |
| Areas to be Evacuated: | | |
| Damage Amount (approximate): | | |
| Medium Affected: | | |
| Medium Description: | | |
| More information on Medium: | | |

| Additional Information |
|---|

**Any information about the incident not recorded elsewhere in this report:**

| Call Notifications | | | | | |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| National Response Center (NRC): | | 1-800-424-8802 | NRC Report # | | |
| PHMSA | ☐ Yes  ☐ No | OSHA | ☐ Yes  ☐ No | State: | ☐ Yes  ☐ No |
| Additional Notifications: | | *Note: It is not necessary to wait for all information before calling NRC* | | | |

**Figure 12.4: Initial Notification Form**

| 1. Event Name | | Prepared by:<br>Date:                    Time: | | | NOTIFICATION REPORT NOTIFICATIONS |
|---|---|---|---|---|---|
| Organization Name | Phone Number | Date/Time Notified | Person Contacted | Notified By | Notes |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

## 12   References or Related Documents

[Reference and Related Documents to be added]

## 13   Plan Maintenance

### Responsibility

Single point accountability (SPA) for the ERP development and maintenance rests with the Director, Regulatory Compliance.  Accountabilities include:

- Development and maintenance of the ERP;
- Ensure systems (ex: Incident Command System) and response structure can meet the requirements specified herein;
- Ensure the ERP is reviewed at least annually and revised/updated as necessary; and
- Ensure SCS employees, contractors, and responders are trained on and provided a copy of the ERP.

### Plan Revisions

Initially, and at regular intervals, SCS will perform hazard assessments to identify possible incidents that have the potential to negatively impact people, the environment, and/or property.  This plan will be updated to address any changes to or new hazards identified in the hazard assessments.

#### Initiating Revisions

All requests for change must be made through the Director, Regulatory Compliance using the Revision Request Form incorporated in this document.

#### Revision Distribution

Plan revisions are issued with an Acknowledgement of Receipt Form and a brief description of the itemized changes.  The Acknowledgement of Receipt Form must be signed and returned to the Director, Regulatory Compliance.  A revised date is shown at the bottom of each updated or new page.  The original date of the manual is August 18, 2022.

| Distribution List | |
|---|---|
| **Copy Number** | **Plan Holder** |
| 1 | **Director, Regulatory Compliance** |
| | **Summit Carbon Solutions** |
| | **3221 North Loop Drive, Suite 221** |
| | **Ames, IA 50010** |
| 2 | TBD Emergency Management/Response Agency Representative(s) |
| 3 (Electronic) | TBD |

Revision after Incident or Exercise

In the event SCS experiences an incident, or conducts an exercise or training session, the effectiveness of the plan will be evaluated and updated to include lessons learned as necessary. After each incident or exercise, a post incident/exercise review will be conducted in a timely manner. The Plan will be evaluated to determine its usefulness during the incident/exercise. Items discussed after an incident include but are not limited to effectiveness of detection and detection equipment, proper and timely notifications, initial and ongoing incident assessments, mobilization of resources, and/or response effectiveness. Consideration will be given to including agency responder personnel in the post-incident or training session review.

Changes in Operating Conditions

If an operating condition changes that would substantially affect the implementation of the plan, SCS will modify the Plan to address such a change. Updates would be implemented prior to the change or interim operating provisions would be instituted until the update is fully implemented.

Change Log

| Date | Rev. No. | Change Location | Brief Description of Change | By |
|------|----------|-----------------|----------------------------|----|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

## Disclaimer

This material is the exclusive property of SCS.  No external distribution or transmission of this material is permitted without prior consent of SCS.

SCS assumes no responsibility for errors or omissions in the document or for direct, incidental, or consequential losses or damages that may result from the external use or duplication of this material. This document is uncontrolled when downloaded or printed without express permission.



```
1                    STATE OF IOWA
                  DEPARTMENT OF COMMERCE
2              BEFORE THE IOWA UTILITIES BOARD

3    - - - - - - - - - - - - - - X    ORIGINAL
     IN RE:                      :
4                                :  Docket No.
     SUMMIT CARBON SOLUTIONS,    :  HLP-2021-001
5    LLC                         :
     - - - - - - - - - - - - - - X
6

7

8              TRANSCRIPT OF HEARING

9                    VOLUME 7

10               PUBLIC TRANSCRIPT

11

12                          Cardiff Event Center at
                            Fort Frenzy
13                          3232 First Avenue South
                            Fort Dodge, Iowa 50501
14                          Tuesday, September 5, 2023

15

16      Met, pursuant to order, at 10:01 a.m.

17

18        BEFORE:  THE IOWA UTILITIES BOARD

19      ERIK M. HELLAND, Board Chair (Presiding)
            JOSHUA J. BYRNES, Board Member
20           SARAH MARTZ, Board Member

21

22           (Pages 1559 to 1865)

23

24   MELISSA A. BURNS - CERTIFIED SHORTHAND REPORTER

25
```

Case 1:22-cv-00020-SMR-SBJ   Document 78-1   Filed 10/12/23   Page 60 of 67

IN RE: SUMMIT CARBON SOLUTIONS
IUB HEARING  09/05/2023                                              Page 1563

```
 1                           I N D E X

 2     WITNESS:                                        PAGE

 3     James Powell

 4     Direct Examination by Mr. Leonard.................1568
       Cross-Examination by Mr. Jorde...................1571
 5     Cross-Examination by Mr. Long....................1702
       Cross-Examination by Ms. Gruenhagen..............1707
 6     Cross-Examination by Mr. Whipple.................1716
       Cross-Examination by Mr. Taylor..................1741
 7     Cross-Examination by Ms. Ryon....................1765
       Cross-Examination by Mr. Murray..................1793
 8     Cross-Examination by Ms. Kohles..................1822
       Examination by Board Member Byrnes...............1826
 9     Examination by Board Member Martz................1862

10     TESTIMONY AND EXHIBITS:           OFFERED   RECEIVED

11     Summit Carbon Solutions:
        Powell Direct Testimony...........  1568       1571
12      Powell Rebuttal Testimony.........  1568       1571

13     Jorde Landowners:
        Hearing Exhibit 506...............  1615       1616
14      Hearing Exhibit 551...............  1606       1606
        Hearing Exhibit 557...............  1682       1682
15      Hearing Exhibit 565...............  1684       1684
        Hearing Exhibit 568...............  1678       1679
16      Hearing Exhibit 569...............  1672       1672
        Hearing Exhibit 570...............  1632       1633
17      Hearing Exhibit 571...............  1632       1632
        Hearing Exhibit 572...............  1696       1697
18      Hearing Exhibit 574...............  1698       1699
        Hearing Exhibit 578...............  1692       1692
19
       OCA:
20      Hearing Exhibit 1.................  1703       1704

21     IFBF:
        Hearing Exhibit 1.................  1713       1713
22

23     (phonetic) indicates a phonetic spelling.
       {sic} indicates the text is as stated.
24     Quoted text is as stated by the speaker.

25
```

Filed with the Iowa Utilities Board on September 25, 2023, HLP-2021-0001

```
 1                        JAMES POWELL,

 2   called as a witness by Summit Carbon Solutions, LLC,

 3   being first duly sworn by Board Chair Helland, was

 4   examined and testified as follows:

 5              BOARD CHAIR HELLAND:  Mr. Dublinske.

 6              Or Mr. Leonard.  Sorry.

 7              MR. LEONARD:  Thank you, Your Honor.

 8                   DIRECT EXAMINATION

 9   BY MR. LEONARD:

10        Q.   Good morning, Mr. Powell.

11        A.   Good morning.

12        Q.   Are you the same James Powell who caused to

13   be filed direct and rebuttal prefiled testimony in

14   this matter?

15        A.   Yes.

16        Q.   If I asked you those same questions today,

17   would your answers be substantially the same?

18        A.   Yes.

19        Q.   Do you have any corrections or

20   modifications to make to your prefiled testimony at

21   this time?

22        A.   No.

23              MR. LEONARD:  Your Honor, before tendering

24   him for cross, I'd like to move admission of James

25   Powell's direct testimony and rebuttal testimony filed
```

```
 1   do they have the release plan for the natural gas --
 2   let's talk about Charles City.  Do they have the
 3   release plan or the dispersant analysis or the blast
 4   radius information for the two natural gas pipelines
 5   that run through that economic development area?  My
 6   guess is they don't.
 7       Q.   Yeah, and I haven't discussed it with them.
 8       A.   So how do the planning and zoning
 9   officials, how do they think through that process with
10   natural gas pipelines compared to a CO pipeline.
11   Which, in my opinion, is much less risky, because it's
12   an asphyxiant just like natural gas, but it's
13   non-ignitable.
14            So they've got to reconcile themselves how
15   one -- they've got to compare the risk profile of one
16   versus the other and if they've considered both
17   properly.
18       Q.   And I'll just suggest perhaps they should
19   do it for both, but, in either case, they would need
20   the information, wouldn't you agree?
21       A.   They would need some level of information,
22   correct.
23       Q.   And I'm glad you brought up Charles City.
24   I want to go back to that issue as the last kind of
25   set of questions I have for you.  But we went over the
```

Case 1:22-cv-00020-SMR-SBJ   Document 78-1   Filed 10/12/23   Page 63 of 67
Filed with the Iowa Utilities Board on September 25, 2023, HLP-2021-0001

    1    fact that you believe one of the reasons that North

    2    Dakota denied the permit was the proximity to the city

    3    of Bismarck; correct?

    4         A.    (Moving head up and down.)

    5         Q.    That's a yes; correct?

    6         A.    Yes.  Sorry.

    7         Q.    Just for the court reporter.  How close was

    8    the proposed route to Bismarck?

    9         A.    It was further away than the pipeline is

   10    from Charles City.  It's a much bigger area with a

   11    much broader economic development footprint.

   12         Q.    Do you know approximately how far?

   13         A.    Not off the top of my head.

   14         Q.    More than a mile?

   15         A.    Yes.

   16         Q.    More than two miles?

   17         A.    Again, it's further than Charles City.

   18         Q.    Well, in Charles City, goes into city

   19    limits, I believe, isn't that correct?

   20         A.    Again, it parallels two natural gas

   21    pipelines.  And I believe, other than the Charles City

   22    economic development group, every easement is signed

   23    along that route.  So the landowners -- and I think

   24    this is an important factor.  The landowners, through

   25    their discussions with us and their own research, have

Filed with the Iowa Utilities Board on September 25, 2023, HLP-2021-0001

```
 1    felt that they had enough information to make a
 2    reasonable decision without the threat of eminent
 3    domain.
 4              MR. JORDE:  Well, objection.  Objection.
 5              BOARD CHAIR HELLAND:  State your objection.
 6              MR. JORDE:  Lack of foundation as to what
 7    other landowners allegedly thought or how they felt.
 8              BOARD CHAIR HELLAND:  Mr. Whipple?
 9              MR. WHIPPLE:  I have no response to
10    Mr. Jorde's objection other than I was simply going to
11    confirm with this witness that his response was a yes
12    to my question.  Which is that it goes into city
13    limits in Charles City.
14              THE WITNESS:  Yes, it parallels those two
15    natural gas pipelines.
16              MR. WHIPPLE:  Since he nodded his head --
17              THE WITNESS:  I said yes.  I said, yes,
18    that it parallels two natural gas pipelines.
19              BOARD CHAIR HELLAND:  Okay.  I think we can
20    move on.
21              MR. WHIPPLE:  Thank you, Mr. Chair.
22    BY MR. WHIPPLE:
23        Q.   Do you know how close the proposed pipeline
24    comes to the city of Earling?
25        A.   I do not.
```

Filed with the Iowa Utilities Board on September 25, 2023, HLP-2021-0001

IN RE: SUMMIT CARBON SOLUTIONS
IUB HEARING  09/05/2023                                          Page 1737

```
 1          Q.   Would you be surprised it was less than a
 2   half a mile?
 3          A.   I do know the city of Earling is not a
 4   high-consequence or could-affect area.  To my
 5   recollection.
 6          Q.   Do you think the people of Earling care
 7   whether they're an HCA?
 8          A.   Again, that's important.
 9          Q.   Would you be surprised to know that the
10   city of Earling submitted an objection in these
11   proceedings and asked that the pipeline route be
12   moved?
13          A.   What was the question?
14          Q.   Would you be surprised to learn that
15   Earling also would like the route moved?
16          A.   Okay.
17          Q.   You're not surprised?
18          A.   I don't know what to think of that.  I
19   haven't seen the objection.
20          Q.   The city council sent a letter in to the
21   Board and it's the direct exhibit of Mr. Willingham,
22   one of the Counties' witnesses.
23               But would you accept if I suggested it was
24   less than a half a mile?  And that they would like to
25   see it be farther away.
```

```
 1          A.   I guess that's an accurate statement.  I
 2     don't know.
 3          Q.   And so I guess what I'm wondering is, if
 4     you're willing to move it for Bismarck, why not
 5     Earling?
 6          A.   Well, as I've said many times in our
 7     conversation with Mr. Jorde this morning, siting is an
 8     exercise in identifying risk and being able to
 9     mitigate that risk.
10          Q.   But I'm really asking you about development
11     and about priorities at the local level.  And, at that
12     level, does it matter that they're a high-consequence
13     area.  They'd like to develop east of Earling.  What
14     makes Earling different than Bismarck?  Other than
15     size.
16          A.   Well, I'm just saying, at this late stage
17     in the project, it's very difficult to move the
18     pipeline.
19          Q.   But not impossible.
20          A.   It's very difficult to move the pipeline
21     within this application.  And I don't intend to amend
22     this application.
23          Q.   But you're moving it in North Dakota.
24          A.   Well, we had some incentive to move it in
25     North Dakota.  Again, that had nothing to do with
```

Filed with the Iowa Utilities Board on September 25, 2023, HLP-2021-0001

```
 1              C E R T I F I C A T E

 2              I, the undersigned, a Certified Shorthand

 3   Reporter of the State of Iowa, do hereby certify that

 4   I acted as the official court reporter at the

 5   proceedings in the above-entitled matter at the time

 6   and place indicated; that I took in shorthand all of

 7   the proceedings had at the said time and place and

 8   that said shorthand notes were reduced to typewriting

 9   under my direction and supervision, and that the

10   foregoing typewritten pages are a full and complete

11   transcript of the shorthand notes so taken.

12              Dated this 22nd day of September, 2023.

13

14

15

16              CERTIFIED SHORTHAND REPORTER
                Melissa A. Burns, Iowa CSR #527
17

18

19

20

21

22

23

24

25
```